## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KONAN CHIANG, Derivatively on Behalf of FIBROGEN, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| ENRIQUE CONTERNO, PAT COTRONEO, CHRISTINE CHUNG, MARK EISNER, JAMES A. SCHOENECK, THE ESTATE OF THOMAS B. NEFF, K. PEONY YU, SUZANNE BLAUG, AOIFE BRENNAN, BENJAMIN F. CRAVATT, JEFFREY L. EDWARDS, JEFFREY W. HENDERSON, MAYKIN HO, THOMAS F. KEARNS JR., GERALD LEMA, RORY B. RIGGS, KALEVI KURKIJÄRVI, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. |
| Individual Defendants, -and- | ) ) ) ) |
| FIBROGEN, INC., a Delaware corporation, | ) ) |
| Nominal Defendant. | ) ) ) |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Konan Chiang ("Plaintiff"), by her attorneys, submits this Verified Stockholder Derivative Complaint for violations of securities laws, breach of fiduciary duty, waste of corporate assets, unjust enrichment, and insider trading. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant FibroGen, Inc. ("FibroGen" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to FibroGen's reputation, goodwill, and standing in the business community and has exposed FibroGen to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged FibroGen in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by FibroGen's directors and officers from December 20, 2018 through the present (the "Relevant Period").

3.      FibroGen is a biopharmaceutical company, incorporated in 1993, that discovers, develops, and commercializes therapeutics. The Company's flagship drug in development is Roxadustat, an oral treatment for anemia in patients with chronic kidney disease ("CKD"). The Company has conducted several trials for the clinical development of this drug, which is currently in Phase 3 clinical development in the U.S., Europe, and China for anemia associated with myelodysplastic syndromes, and in a Phase 2 trial in the U.S. for treatment of chemotherapy-induced anemia.

4.      The standard treatment for anemia in CKD patients is through an erythropoiesis-stimulating agent ("ESA"), which uses a different mechanism to treat anemia than the mechanism used by Roxadustat. The most prominent ESA, representing the current standard of care, is a drug called Epogen (also referred to as "epoetin alfa").

5.      During the Relevant Period, the Individual Defendants (defined below) caused or

2

allowed the Company to make false and misleading statements regarding Roxadustat's clinical trial data. Not only did the Company falsely indicate that the drug had met certain objectives, but also FibroGen claimed that, on the strength of this false and misleading data, the United States Food and Drug Administration ("FDA") was likely to approve the Company's new drug application ("NDA") for Roxadustat.[1]

6.     The Individual Defendants were motivated to engage in this campaign to tout Roxadustat's clinical trial data, claim that the drug had met certain objectives, and allow the Company to manipulate data to make FDA approval of the drug appear likely. This had the effect of artificially inflating the Company's stock price. Meanwhile, certain defendants sold over $52 million worth of their stock in the Company at inflated prices. FibroGen's inflated stock price reached $55.72 per share on February 12, 2021. Former CEO and Chairman Thomas B. Neff alone sold $32 million worth of stock in less than one year.

7.     However, contrary to the Company's statements during the Relevant Period, Roxadustat's data was not based on pre-specified analyses that FibroGen had agreed upon with the FDA and the data did not support the Individual Defendants' claims about the purported efficacy and safety of Roxadustat.

8.     On December 18, 2020, during after-market hours, the truth began to be revealed when the Company announced that the FDA had extended the review period of the NDA for Roxadustat by three months. On this news, the Company's stock price fell to $40.01 on December 21, 2020, a 9% decrease from the previous trading day's closing price of $43.97. Although the stock price fell, it was still inflated because the Individual Defendants failed to

---

[1] According to the FDA, "[t]he NDA application is the vehicle through which drug sponsors formally propose that the FDA approve a new pharmaceutical for sale and marketing in the U.S." *New Drug Application*, FDA (June 10, 2019), https://www.fda.gov/drugs/types-applications/new-drug-application-nda.

reveal the full truth about Roxadustat.

9.      On March 1, 2021, again during after-market hours, the Company announced that the FDA would hold an advisory committee[2] (the "Advisory Committee") meeting to review the NDA for Roxadustat. This shocked analysts and investors because the FDA typically does not call for an advisory committee meeting so late in the application process. As a result, the stock price fell to $38.07 on March 2, 2021, a 24% decrease from the previous trading day's closing price of $50.53. Again, even though the stock had plummeted dramatically, the Individual Defendants were still obscuring the full truth regarding Roxadustat's efficacy and safety.

10.     On April 6, 2021, the Company issued a statement "provid[ing] clarification of certain prior disclosures of U.S. primary cardiovascular safety analyses from the roxadustat Phase 3 program for the treatment of anemia of chronic kidney disease ('CKD')." Specifically, the Company stated that the safety analyses "included post-hoc changes to the stratification factors." The Company further revealed that, based on analyses using the pre-specified stratification factors, the Company could not conclude that Roxadustat was superior to epoetin alfa. On this news, the Company's stock price fell to $19.74 on April 7, 2021, a 43% decrease from the previous trading day's closing price of $34.64. As with the Company's previous partial disclosures, although the stock price had plummeted, the Individual Defendants continued to take great pains to keep the truth regarding Roxadustat's efficacy and safety concealed from the market.

11.     On July 15, 2021, during after-market hours, the Advisory Committee held a meeting to evaluate Roxadustat's NDA. The Advisory Committee concluded that Roxadustat's

---

[2] The "FDA's Advisory Committees provide independent advice from outside experts on issues related to human and veterinary drugs, biological products, medical devices, and food." *FDA-TRACK: Advisory Committees Dashboard*, FDA (Sept. 30, 2021), https://www.fda.gov/about-fda/fda-track-agency-wide-program-performance/fda-track-advisory-committees-dashboard.

trial data was difficult to calculate. Regarding safety, the Advisory Committee noted that death rates were higher in patients who received Roxadustat than patients who received Epogen. It became clear that the Company's strategy was to present a dose mitigation strategy to the Advisory Committee. This strategy put the Company between a rock and a hard place, however, because lowering the dosage could make Roxadustat safer, but it would also lower its efficacy. In summary, Roxadustat was neither safer nor more effective than Epogen. On this news, the Company's stock price fell to $14.35 on July 16, 2021, a Friday. The stock continued to tumble after the weekend, plummeting to $13.72 on July 19, 2021, a 44% decrease from the July 15, 2021 closing price of $24.84.

12.     The revelation of accurate data regarding Roxadustat's efficacy and safety resulted in FibroGen's stock plummeting more than 68% from its December 18, 2020 stock price of $43.97 per share, thus destroying billions of dollars in the Company's market capitalization.

13.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these materially false and misleading statements and omissions. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over reporting of trial results of its key drug Roxadustat, which meant the Company's financial prospects were made to look far better than they actually were. Specifically, the Individual Defendants represented to investors both before and throughout the Relevant Period that Roxadustat was a successful treatment for incident dialysis and non-dialysis dependent patients which represented a "potential global multi-billion-dollar market" opportunity.

14.     As detailed herein, and as alleged in the ongoing federal securities class action in the Northern District of California styled *In re FibroGen, Inc. Securities Litigation*, No. 3:21-cv-

02623-EMC (the "Federal Securities Class Action"), FibroGen's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise federal questions under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

17.     Venue is proper in this District because FibroGen is incorporated in this District, and the Defendants' activities have had an effect in this District.

## THE PARTIES

### Plaintiff

18.     Plaintiff Konan Chiang is and has continuously been a stockholder of FibroGen during the wrongdoing complained of herein.

### Nominal Defendant

19.     Nominal Defendant FibroGen is a Delaware corporation with its principal executive offices located at 409 Illinois Street, San Francisco, California 94158. FibroGen's shares trade on the NASDAQ under the ticker symbol "FGEN."

### The Individual Defendants

20.     Defendant Enrique Conterno ("Conterno") has served as the Company's CEO since January 6, 2020 and is a member of the Board.

21.     Defendant Pat Cotroneo ("Cotroneo") served as the Company's CFO from 2008 until September 6, 2021. The Company announced his that he would remain with FibroGen through March 31, 2022, however, as Executive Advisor to the CEO.  During the Relevant Period, Cotroneo made the following sales of stock on the basis of material, non-public information:

| Date | Shares sold | Price | Proceeds |
|------|-------------|-------|----------|
| Feb. 28, 2019 | 14,787 | $60.07 | $888,255 |
| Mar. 19, 2019 | 7,665 | $55.41 | $424,717 |
| June 18, 2019 | 3,201 | $43.12 | $138,027 |
| Sep. 17, 2019 | 3,201 | $41.38 | $132,457 |
| Dec. 20, 2019 | 46,727 | $45.51 | $2,126,545 |
| Dec. 20, 2019 | 12,729 | $46.27 | $588,970 |
| Mar. 16, 2020 | 9,239 | $26.36 | $243,540 |
| June 16, 2020 | 3,928 | $39.68 | $155,863 |
| Aug. 7, 2020 | 22,554 | $48 | $1,082,592 |
| Sep. 3, 2020 | 15,004 | $50.91 | $763,853 |
| Sep. 15, 2020 | 3,070 | $43.63 | $133,944 |
| Dec. 15, 2020 | 3,068 | $43.60 | $133,764 |
| June 15, 2021 | 4,053 | $25.62 | $103,837 |
|  |  | **TOTAL PROCEEDS:** | **$6,916,369** |

22.     Defendant Christine Chung ("Chung") has been Senior Vice President of China Operations at FibroGen since 2007. During the Relevant Period, Chung made the following sales of stock on the basis of material, non-public information:

| Date | Shares sold | Price | Proceeds |
|------|-------------|-------|----------|
| May 7, 2019 | 1,925 | $46.04 | $88,627 |
| May 7, 2019 | 3,500 | $46.70 | $163,450 |
| May 7, 2019 | 200 | $47.44 | $9,488 |
| May 8, 2019 | 4,125 | $46.20 | $190,575 |
| May 8, 2019 | 1,500 | $46.62 | $69,930 |
| June 18, 2019 | 5,625 | $44.08 | $247,950 |
| June 19, 2019 | 5,625 | $44.02 | $247,612 |
| July 10, 2019 | 5,025 | $44.75 | $224,868 |
| July 10, 2019 | 600 | $45.14 | $27,084 |
| July 11, 2019 | 5,525 | $45.13 | $249,343 |
| July 11, 2019 | 100 | $45.72 | $4,572 |

| | | | |
|---|---|---|---|
| Aug. 22, 2019 | 5,325 | $43.79 | $233,181 |
| Aug. 22, 2019 | 300 | $44.67 | $13,401 |
| Aug. 23, 2019 | 3,225 | $42.05 | $135,611 |
| Aug. 23, 2019 | 1,816 | $42.94 | $77,979 |
| Aug. 23, 2019 | 584 | $43.68 | $25,509 |
| Sep. 19, 2019 | 2,225 | $40 | $89,000 |
| Sep. 19, 2019 | 3,400 | $40.75 | $138,550 |
| Sep. 20, 2019 | 5,625 | $39.87 | $224,268 |
| Oct. 8, 2019 | 3,225 | $36.55 | $117,873 |
| Oct. 8, 2019 | 2,400 | $37.10 | $89,040 |
| Oct. 9, 2019 | 5,625 | $36.58 | $205,762 |
| Nov. 13, 2019 | 5,625 | $34.54 | $194,287 |
| Nov. 14, 2019 | 3,600 | $34.50 | $124,200 |
| Nov. 14, 2019 | 2,025 | $35.18 | $71,239 |
| Dec. 16, 2019 | 2,850 | $46.80 | $133,380 |
| Dec. 16, 2019 | 2,775 | $47.37 | $131,451 |
| Dec. 17, 2019 | 5,336 | $46.95 | $250,525 |
| Dec. 17, 2019 | 289 | $47.47 | $13,718 |
| Jan. 6, 2020 | 5,625 | $42.98 | $241,762 |
| Jan. 7, 2020 | 5,625 | $42.76 | $240,525 |
| Feb. 11, 2020 | 5,625 | $44.48 | $250,200 |
| Feb. 12, 2020 | 5,025 | $45.94 | $230,848 |
| Feb. 12, 2020 | 600 | $46.28 | $27,768 |
| Mar. 18, 2020 | 905 | $23.69 | $21,439 |
| Mar. 18, 2020 | 1,500 | $24.56 | $36,840 |
| Mar. 18, 2020 | 1,500 | $25.68 | $38,520 |
| Mar. 19, 2020 | 300 | $23.93 | $7,179 |
| Mar. 19, 2020 | 830 | $25.32 | $21,015 |
| Mar. 19, 2020 | 6,215 | $26.08 | $162,087 |
| | | **TOTAL PROCEEDS:** | **$5,070,665** |

23.     Defendant Mark Eisner ("Eisner") has served as the Company's Chief Medical Officer since December 21, 2020.

24.     Defendant James A. Schoeneck ("Schoeneck") has served as a Company director since April 2010. Defendant Schoeneck served as interim CEO of FibroGen from August 2019 until January 2020. From the start of the Relevant Period until August 2019, he served as a member of the Audit Committee. During the Relevant Period, Defendant Schoeneck made the following sales of stock on the basis of material, non-public information:

| Date | Shares sold | Price | Proceeds |
|---|---|---|---|
| Jan. 7, 2019 | 2,000 | $45.90 | $91,800 |
| Feb. 7, 2019 | 2,000 | $57.17 | $114,340 |
| Mar. 7, 2019 | 1,620 | $54.62 | $88,484 |
| Mar. 7, 2019 | 380 | $55.23 | $20,987 |
| Apr. 8, 2019 | 2,000 | $52.90 | $105,800 |
| May 7, 2019 | 1,500 | $46.80 | $70,200 |
| May 7, 2019 | 500 | $47.69 | $23,845 |
| | | **TOTAL PROCEEDS:** | **$515,456** |

25.    Defendant K. Peony Yu ("Yu") served as Chief Medical Officer of FibroGen from April 2016 through December 20, 2020. During the Relevant Period, Yu made the following sales of stock on the basis of material, non-public information:

| Date | Shares sold | Price | Proceeds |
|---|---|---|---|
| Mar. 14, 2019 | 9,145 | $56.30 | $514,864 |
| June 14, 2019 | 3,420 | $40.96 | $140,083 |
| Sep. 16, 2019 | 3,419 | $40.92 | $139,905 |
| Dec. 16, 2019 | 3,420 | $46.68 | $159,646 |
| July 24, 2020 | 3,351 | $42.35 | $141,915 |
| Sep. 3, 2020 | 10,000 | $50.89 | $508,900 |
| Sep. 16, 2020 | 3,351 | $44.01 | $147,478 |
| Dec. 16, 2020 | 3,350 | $41.61 | $139,394 |
| | | **TOTAL PROCEEDS:** | **$1,892,184** |

26.    Defendant Suzanne Blaug ("Blaug") has served as a FibroGen director since June 10, 2019.

27.    Defendant Aoife Brennan ("Brennan") has served as a Company director since August 5, 2020.

28.    Defendant Benjamin F. Cravatt ("Cravatt") has served as a Company director since August 5, 2020.

29.    Defendant Jeffrey L. Edwards ("Edwards") has served as a Company director since 2015. Edwards also serves as Chairman of the Audit Committee.

30.   Defendant Jeffrey W. Henderson ("Henderson") has served as a Company director since 2015.

31.   Defendant Maykin Ho ("Ho") has served as a Company director since 2018. Ho also serves as a member of the Audit Committee.

32.   Defendant Thomas F. Kearns Jr. ("Kearns") has served as a Company director since 1996. During the Relevant Period, Kearns made the following sales of stock on the basis of material, non-public information:

| Date | Shares sold | Price | Proceeds |
| --- | --- | --- | --- |
| Mar. 19, 2020 | 18,000 | $23.17 | $417,074 |
| Mar. 11, 2021 | 18,000 | $35.02 | $630,360 |
| | | **TOTAL PROCEEDS:** | **$1,047,434** |

33.   Defendant Gerald Lema ("Lema") has served as a FibroGen director since 2017. Lema also serves as a member of the Audit Committee.

34.   Defendant Rory B. Riggs ("Riggs") has served as a FibroGen director since 1993. Riggs has also served as a member of the Audit Committee during the Relevant Period.

35.   Defendant Kalevi Kurkijärvi ("Kurkijärvi") served as a FibroGen director until his resignation on June 30, 2021. Kurkijärvi also served as a member of the Audit Committee during the Relevant Period. During the Relevant Period, Kurkijärvi made the following sales of stock on the basis of material, non-public information:

| Date | Shares sold | Price | Proceeds |
| --- | --- | --- | --- |
| Apr. 8, 2019 | 3,427 | $52.95 | $181,460 |
| Apr. 8, 2019 | 573 | $53.51 | $30,661 |
| Apr. 15, 2019 | 4,000 | $48.09 | $192,360 |
| May 8, 2019 | 5,056 | $45.83 | $231,716 |
| May 8, 2019 | 944 | $46.51 | $43,905 |
| June 6, 2019 | 2,942 | $37.20 | $109,442 |
| June 6, 2019 | 3,058 | $38.49 | $117,702 |
| July 8, 2019 | 4,600 | $42.35 | $194,810 |
| July 8, 2019 | 1,400 | $43.40 | $60,760 |

| Aug. 5, 2019 | 6,000 | $45.22 | $271,320 |
| Sep. 9, 2019 | 5,580 | $40.90 | $228,222 |
| Sep. 9, 2019 | 420 | $41.67 | $17,501 |
| Oct. 7, 2019 | 6,000 | $36.73 | $220,380 |
| Nov. 7, 2019 | 4,514 | $38.08 | $171,893 |
| Nov. 7, 2019 | 1,486 | $38.85 | $57,731 |
| Dec. 9, 2019 | 6,000 | $47.50 | $285,000 |
| Jan. 6, 2020 | 6,000 | $42.66 | $255,960 |
| Feb. 10, 2020 | 6,000 | $42.69 | $256,140 |
| Dec. 28, 2020 | 5,901 | $40.39 | $238,341 |
| Dec. 28, 2020 | 100 | $41.14 | $4,114 |
| Jan. 14, 2021 | 5,999 | $40.04 | $240,200 |
| Jan. 19, 2021 | 6,000 | $43.38 | $260,280 |
| Feb. 17, 2021 | 5,156 | $52.31 | $269,710 |
| Feb. 17, 2021 | 844 | $52.93 | $44,673 |
| | | **TOTAL** | **$3,984,284** |

36.     Defendant the Estate of Thomas B. Neff represents the property owned by Thomas B. Neff ("Neff") at the time of his unexpected death in August 2019. Prior to his passing, Neff served as the Company's Chairman and CEO. During the Relevant Period, Neff made the following sales of stock on the basis of material, non-public information:

| Date | Shares sold | Price | Proceeds |
| --- | --- | --- | --- |
| Jan. 3, 2019 | 11,900 | $43.08 | $512,652 |
| Jan. 3, 2019 | 11,493 | $44.12 | $507,071 |
| Jan. 3, 2019 | 6,507 | $44.84 | $291,773 |
| Jan. 3, 2019 | 100 | $45.75 | $4,575 |
| Jan. 4, 2019 | 4,400 | $44.12 | $194,128 |
| Jan. 4, 2019 | 25,600 | $45.05 | $1,153,280 |
| Jan. 22, 2019 | 26,450 | $51.93 | $1,373,548 |
| Jan. 22, 2019 | 3,550 | $52.42 | $186,091 |
| Jan. 23, 2019 | 12,848 | $51.46 | $661,158 |
| Jan. 23, 2019 | 12,975 | $52.37 | $679,500 |
| Jan. 23, 2019 | 2,085 | $52.93 | $110,359 |
| Jan. 23, 2019 | 702 | $51.83 | $36,384 |
| Jan. 23, 2019 | 1,390 | $52.59 | $73,100 |
| Feb. 7, 2019 | 19,015 | $55.94 | $1,063,699 |
| Feb. 7, 2019 | 5,013 | $57.06 | $286,041 |
| Feb. 7, 2019 | 3,847 | $55.98 | $215,355 |
| Feb.7, 2019 | 487 | $57.01 | $27,763 |
| Feb. 8, 2019 | 5,257 | $56.54 | $297,230 |

| | | | |
|---|---|---|---|
| Feb. 8, 2019 | 13,593 | $57.05 | $775,480 |
| Feb. 8, 2019 | 50 | $57.68 | $2,884 |
| Feb. 8, 2019 | 818 | $56.79 | $46,454 |
| Feb. 8, 2019 | 100 | $57.68 | $5,768 |
| Feb. 19, 2019 | 18,100 | $57.69 | $1,044,189 |
| Feb. 19, 2019 | 800 | $58.26 | $46,608 |
| Feb. 19, 2019 | 918 | $57.67 | $52,941 |
| Feb. 20, 2019 | 9,050 | $56.71 | $513,225 |
| Feb. 20, 2019 | 9,850 | $57.47 | $566,079 |
| Feb. 20, 2019 | 500 | $56.76 | $28,380 |
| Feb. 20, 2019 | 418 | $57.41 | $23,997 |
| Mar. 6, 2019 | 9,464 | $55.84 | $528,469 |
| Mar. 6, 2019 | 7,836 | $56.84 | $445,398 |
| Mar. 6, 2019 | 1,100 | $57.68 | $63,448 |
| Mar. 6, 2019 | 818 | $55.81 | $45,652 |
| Mar. 6, 2019 | 600 | $56.86 | $34,116 |
| Mar. 7, 2019 | 17,200 | $54.90 | $944,280 |
| Mar. 7, 2019 | 1,200 | $55.47 | $66,564 |
| Mar. 7, 2019 | 1,318 | $54.89 | $72,345 |
| Mar. 7, 2019 | 100 | $55.45 | $5,545 |
| Mar. 20, 2019 | 11,134 | $55.14 | $613,928 |
| Mar. 20, 2019 | 7,266 | $55.83 | $405,660 |
| Mar. 20, 2019 | 428 | $55.09 | $23,578 |
| Mar. 20, 2019 | 990 | $55.83 | $55,271 |
| Mar. 21, 2019 | 9,642 | $55.37 | $533,877 |
| Mar. 21, 2019 | 8,758 | $55.85 | $489,134 |
| Mar. 21, 2019 | 1,418 | $55.83 | $79,166 |
| Apr. 3, 2019 | 18,200 | $54.63 | $994,266 |
| Apr. 3, 2019 | 200 | $55.24 | $11,048 |
| Apr. 3, 2019 | 1,418 | $54.60 | $77,422 |
| Apr. 4, 2019 | 13,900 | $53.17 | $739,063 |
| Apr. 4, 2019 | 2,700 | $54.24 | $146,448 |
| Apr. 4, 2019 | 1,800 | $55.14 | $99,252 |
| Apr. 4, 2019 | 1,118 | $53.12 | $59,388 |
| Apr. 4, 2019 | 200 | $53.97 | $10,794 |
| Apr. 4, 2019 | 100 | $55.13 | $5,513 |
| Apr. 17, 2019 | 14,836 | $46.60 | $691,357 |
| Apr. 17, 2019 | 3,464 | $47.17 | $163,396 |
| Apr. 17, 2019 | 100 | $48.75 | $4,875 |
| Apr. 17, 2019 | 1,318 | $46.60 | $61,418 |
| Apr. 17, 2019 | 100 | $47.09 | $4,709 |
| Apr. 18, 2019 | 3,217 | $45.69 | $146,984 |
| Apr. 18, 2019 | 8,625 | $46.82 | $403,822 |

| | | | |
|---|---|---|---|
| Apr. 18, 2019 | 6,558 | $47.34 | $310,455 |
| Apr. 18, 2019 | 200 | $45.33 | $9,066 |
| Apr. 18, 2019 | 1,218 | $47.13 | $57,404 |
| May 13, 2019 | 6,200 | $35.23 | $218,426 |
| May 13, 2019 | 11,500 | $36.07 | $414,805 |
| May 13, 2019 | 700 | $36.92 | $25,844 |
| May 13, 2019 | 918 | $35.52 | $32,607 |
| May 13, 2019 | 500 | $36.21 | $18,105 |
| May 14, 2019 | 6,350 | $36.40 | $231,140 |
| May 14, 2019 | 12,050 | $37.12 | $447,296 |
| May 14, 2019 | 1,100 | $36.77 | $40,447 |
| May 14, 2019 | 318 | $37.37 | $11,883 |
| May 22, 2019 | 18,400 | $35.73 | $657,432 |
| May 22, 2019 | 1,418 | $35.71 | $50,636 |
| May 23, 2019 | 17,300 | $35 | $605,500 |
| May 23, 2019 | 1,100 | $35.25 | $38,775 |
| May 23, 2019 | 1,418 | $35.05 | $49,700 |
| June 5, 2019 | 16,878 | $38.43 | $648,621 |
| June 5, 2019 | 1,522 | $38.97 | $59,312 |
| June 5, 2019 | 1,418 | $38.52 | $54,621 |
| June 6, 2019 | 6,900 | $37.57 | $259,233 |
| June 6, 2019 | 11,500 | $38.16 | $438,840 |
| June 6, 2019 | 8,542 | $38.31 | $327,244 |
| June 6, 2019 | 800 | $37.77 | $30,216 |
| June 6, 2019 | 618 | $38.20 | $23,607 |
| June 19, 2019 | 18,400 | $44.02 | $809,968 |
| June 19, 2019 | 1,418 | $43.99 | $62,377 |
| June 20, 2019 | 16,200 | $44.28 | $717,336 |
| June 20, 2019 | 2,200 | $45.22 | $99,484 |
| June 20, 2019 | 1,318 | $44.23 | $58,295 |
| June 20, 2019 | 100 | $45.45 | $4,545 |
| July 10, 2019 | 12,167 | $44.66 | $543,378 |
| July 10, 2019 | 6,233 | $45.07 | $280,921 |
| July 10, 2019 | 1,418 | $44.81 | $63,540 |
| July 11, 2019 | 17,900 | $45.14 | $808,006 |
| July 11, 2019 | 500 | $45.66 | $22,830 |
| July 11, 2019 | 1,418 | $45.09 | $63,937 |
| July 24, 2019 | 18,400 | $46.54 | $856,336 |
| July 24, 2019 | 1,418 | $46.57 | $66,036 |
| July 25, 2019 | 16,500 | $46.86 | $773,190 |
| July 25, 2019 | 1,900 | $47.72 | $90,668 |
| July 25, 2019 | 1,318 | $46.80 | $61,682 |
| July 25, 2019 | 100 | $47.90 | $4,790 |

| Aug. 12, 2019 | 10,700 | $44.98 | $481,286 |
| Aug. 12, 2019 | 7,700 | $45.59 | $351,043 |
| Aug. 12, 2019 | 1,118 | $45.04 | $50,354 |
| Aug. 12, 2019 | 300 | $45.67 | $13,701 |
| Aug. 13, 2019 | 11,500 | $45.33 | $521,295 |
| Aug. 13, 2019 | 6,900 | $46.19 | $318,711 |
| Aug. 13, 2019 | 918 | $45.31 | $41,594 |
| Aug. 13, 2019 | 500 | $46.17 | $23,085 |
| Aug. 21, 2019 | 18,400 | $44.79 | $824,136 |
| Aug. 21, 2019 | 1,418 | $44.81 | $63,540 |
| Aug. 22, 2019 | 17,100 | $43.80 | $748,980 |
| Aug. 22, 2019 | 1,300 | $44.73 | $58,149 |
| Aug. 22, 2019 | 1,418 | $43.77 | $62,065 |
| | | **TOTAL** | **$32,812,401** |

37.     Collectively, Defendants Conterno, Cotroneo, Eisner, Chung, Schoeneck, Neff, Yu, Blaug, Brennan, Cravatt, Edwards, Henderson, Ho, Kearns, Lema, Riggs, and Kurkijärvi, are referred to herein as the "Individual Defendants."

38.     The Individual Defendants, because of their positions with FibroGen, possessed the power and authority to control the contents of FibroGen's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations concerning the Company's financial condition – which included, *inter alia*, statements concerning Roxadustat's purported safety and efficacy, its Phase 3 trial results, the NDA approval process, and Roxadustat's prospects for FDA approval – were then materially false and/or misleading.

14

## SUBSTANTIVE ALLEGATIONS

### Background of FibroGen's Flagship Drug, Roxadustat

39.     During the Relevant Period, FibroGen's most important drug prospect was Roxadustat. Roxadustat works as a hypoxia-inducible factor prolyl hydroxylase ("HIF-PH") inhibitor, which unlike other anemia drugs on the market, is designed to stimulate the body's natural red blood cell production to treat anemia. Anemia is a common complication of chronic kidney disease and not only causes severe fatigue and reduction in quality of life, but is also associated with increased risk of death. The standard treatment for anemia in CKD patients is Epogen.

40.     Epogen was Roxadustat's main competitor in this market. However, FibroGen tried to differentiate Roxadustat from Epogen, as Epogen has significant shortcomings. Namely, since Epogen is administered by injection or intravenously, patients usually need to visit a doctor or a hospital to receive treatment. Epogen, therefore, it is not as easily administered to patients as an oral medication would be, particularly for patients who are not yet on dialysis. Further, Epogen is not recommended for use in less severe CKD cases, including non-dialysis dependent ("NDD") and new-to-dialysis patients (sometimes referred to as "incident dialysis" patients), because Epogen increases the risk of Major Adverse Cardiac Events ("MACE")[3] and other serious adverse reactions such as thrombosis, hypertension, and seizures.

41.     Given these serious risks, the FDA has required a "black box" warning on the labels of Epogen and other ESAs, warning consumers that ESAs increase the risk of death, serious cardiac events, thrombosis, and tumors, among other serious complications.

---

[3] "MACE" is a composite measure of serious cardiovascular events defined to include stroke, myocardial infarction, and cardiovascular death.

42.     In its campaign to sell the benefits of Roxadustat over Epogen, FibroGen touted that Roxadustat was a drug that not only "could deliver the therapeutic benefits" of Epogen for dialysis-dependent (also referred to herein as "DD") patients with "the convenience of a pill," but that it would also be safe for use by non-dialysis dependent and incident dialysis patients, for whom Epogen was not safe. FibroGen touted Roxadustat as "an oral agent with a potentially more favorable safety profile" than Epogen, and claimed that Roxadustat would "expand the market for anemia treatment by penetrating the NDD-chronic kidney disease market," which was "substantially larger" than the dialysis-dependent market.

43.     In 2013, FibroGen reached an agreement with the company AstraZeneca PLC ("AstraZeneca") to develop and commercialize Roxadustat for the United States market.

44.      Under this agreement, FibroGen would be primarily responsible for the development of Roxadustat and the analysis of Roxadustat's critical clinical trial data, while AstraZeneca would pay for ongoing costs and make milestone payments to FibroGen as development and regulatory goals were met. For example, FibroGen disclosed in its Form 10-Q dated May 7, 2020 that "[p]otential milestone payments" under its agreement with AstraZeneca "total[ed] $1.2 billion", of which $571 million were for "development and regulatory milestones and $652.5 million [for] commercial-based milestones." Total consideration under the agreement could reach as high as $1.6 billion.

45.     FibroGen's agreement with AstraZeneca expressly designated FibroGen as the "lead regulatory party in the U.S…through approval of the first NDA" for Roxadustat. The agreement further specified that, in that role, FibroGen would "be responsible for preparing and filing all Regulatory Materials" and would "have primary operational responsibility for interactions with [the FDA], including taking the lead role at all meetings with [the FDA]."

**Phase 3 Roxadustat Trials**

46.     In order to obtain FDA approval of a drug, a pharmaceutical company typically must conduct three sequential phased trials designed to demonstrate that a drug is both safe and effective. Phase 3 trials are used to confirm that a drug's benefits outweigh any adverse safety events before the FDA grants approval of an NDA.

47.     Shortly before the start of the Relevant Period, FibroGen completed its Phase 3 clinical trials for Roxadustat, which involved over 9,000 chronic kidney disease patients from three key patient populations that were expected to use Roxadustat. These studies included the following: (i) four studies involving dialysis-dependent patients; (ii) one study specifically focused on a subpopulation consisting of new-to-dialysis or incident dialysis patients, in which Roxadustat was compared against Epogen; and (iii) three studies of non-dialysis dependent patients in which Roxadustat was compared to placebo (since Epogen was not typically used to treat anemia in non-dialysis dependent patients).

48.     For FibroGen to receive FDA approval for Roxadustat, it was critical for FibroGen to demonstrate not only that Roxadustat was at least as safe as the existing standard of care for dialysis-dependent patients (Epogen), but also that it was at least as safe as placebo and therefore did not require a "black box" warning. Without a "black box" warning, Roxadustat could be recommended to non-dialysis dependent and incident dialysis patients, which would be the main differentiating factor between Epogen and Roxadustat.

49.     FibroGen's CEO at the time, Defendant Neff, explained that, with respect to safety, the goal of these trials was to show that Roxadustat was "non-inferior" relative to the relevant comparator (i.e., Epogen or placebo) in all three patient populations.

50.     FibroGen evaluated the safety of Roxadustat by looking at three key safety endpoints in each patient population, namely: (i) MACE, a crucial metric the FDA primarily evaluated when considering an NDA for anemia treatments; (ii) all-cause mortality, or "ACM," which evaluated deaths caused by Roxadustat for any reason and would also be a focus of the FDA; and (iii) "MACE+," a composite endpoint that included all MACE events in addition to hospitalizations, which was the primary focus of European regulatory authorities (and not the FDA). The resulting safety data for Roxadustat would therefore produce nine separate analyses of the safety of the drug, with evaluations of MACE, MACE+ and ACM for each of the three patient populations – dialysis-dependent, non-dialysis dependent, and incident dialysis patients. If Roxadustat achieved positive safety results in all nine scenarios, FibroGen contended that the results would unequivocally indicate that Roxadustat had shown its "non-inferiority" to placebo and Epogen.

51.     These three safety endpoints, including the key MACE endpoint that would be the primary focus of the FDA, were measured by what is known as a "hazard ratio," a metric that compared, on the one hand, the length of time until an adverse safety event occurred for patients on Roxadustat, and on the other, the length of time until an adverse safety event occurred for comparison patients (i.e., patients taking Epogen or placebo). A hazard ratio of 0.5 meant that, for a given time period, half as many patients taking Roxadustat experienced an adverse safety event compared to Epogen or placebo. In comparison, a hazard ratio of 2.0 meant that, for a given time period, twice as many patients taking Roxadustat experienced an adverse safety event compared to Epogen or placebo.

52.     Therefore, the smaller the hazard ratio, the safer the drug. Significantly, if the hazard ratio was below 1.0, the FDA could conclude that Roxadustat was actually safer than

Epogen in dialysis-dependent/incident dialysis patients or placebo in non-dialysis dependent patients (provided the difference was statistically significant). The Individual Defendants described this as the biggest indicator of success for Roxadustat.

53.     In contrast, if the upper bound of the hazard ratio were to significantly exceed 1.0, the drug would be deemed less safe than placebo or Epogen, with the FDA deeming a hazard ratio of 1.25 or above as indicating that an anemia drug was less safe than or inferior to Epogen or placebo. Therefore, if the studies showed that the hazard ratio for Roxadustat versus placebo was 1.25 or above, Roxadustat's prospects for approval with no "black box" warning – and its ability to access the untapped $3.5 billion market – would fail. Specifically, if the hazard ratio for Roxadustat versus Epogen was 1.25 or above, Roxadustat would be deemed too unsafe for approval for any patient population at all, regardless of a label warning.

54.     Therefore, Roxadustat's future financial prospects rested almost entirely on the achievement of these three safety endpoints in the Phase 3 Roxadustat trials – especially the MACE endpoint that would primarily inform the FDA's decision of whether to approve Roxadustat and for which patient populations.

**The Individual Defendants' Materially False and Misleading Statements Regarding Roxadustat During the Relevant Period**

*December 20, 2018 Press Release*

55.     On December 20, 2018, the first day of the Relevant Period, FibroGen issued a press release, also filed on Form 8-K with the SEC, announcing "Positive Topline Results from Three Global Phase 3 Trials of Roxadustat." In the press release, the Individual Defendants made materially false statements regarding the purported efficacy and safety of Roxadustat. For example, FibroGen's then-CEO, Defendant Neff, was quoted as stating "[t]his is the first well-controlled CKD anemia program that has shown improved efficacy in incident and stable

dialysis patients relative to ESA standard of care therapy." Similarly, Defendant Yu claimed that Roxadustat had "**achieved superiority in efficacy not only against placebo but also over active comparator [Epogen] in our studies**," and emphasized that "**[t]hese results support [R]oxadustat's potential to bring clinical benefit over current standard of care.**" (Emphasis added). The press release further highlighted certain specific efficacy results, noting that "in the pre-specified secondary efficacy analysis, Roxadustat-treated patients had a **33% reduction in the risk of blood transfusion compared to [Epogen]**." (Emphasis added).

56.     The press release also included a statement that preliminary safety results were consistent with prior results in other trials, which assured investors that the Company had not observed any concerning safety issues. Specifically, the press release stated: "The preliminary safety analyses of each of these three individual studies show an overall safety profile consistent with the results observed in prior Roxadustat studies. **The adverse events reported are consistent with those expected in these study populations with similar background diseases**." (Emphasis added).

57.     Instead of correcting these materially false and misleading statements, Defendants Cotroneo, Chung, Schoeneck, Yu, Kearns, Kurkijärvi, and Neff (collectively, the "Insiders") began to sell their FibroGen stock on the basis of adverse, material non-public information. For example, Defendant Schoeneck sold 4,000 shares for total proceeds of over $200 thousand on January 7 and February 7, 2019. Defendant Neff sold 207,816 shares from January 3 through February 20, 2019, reaping over $10 million in total proceeds. Accordingly, in violation of the law, throughout the Relevant Period, the Insiders usurped material non-public information, which was the property of the Company, for their own gain.

*February 27, 2019 Conference Call*

58.     On February 27, 2019, FibroGen held a conference call with analysts and investors to discuss the Company's results for the fourth quarter and full year 2018. Defendants Chung, Yu, Cotroneo, and Neff participated in the conference call. During the conference call, Defendant Neff stated that all of the Phase 3 Roxadustat studies "have positive top line results" and "support our NDA [to the FDA]." Defendant Neff further asserted that "based on our review of the data...there is a strong conviction to move ahead to file the NDA."

59.     In addition, Defendant Yu stated that "superiority [to Epogen] was demonstrated in all 3 dialysis studies." Defendant Yu also emphasized that it was of "much clinical importance" and a "big deal" that "Roxadustat was [] shown to have a lower [red blood cell] transfusion risk than ESA." With respect to the preliminary safety data from the trials, Defendant Yu reiterated that the "[r]esults in individual studies are consistent with what one would expect in the study patient population," and stated that FibroGen was "**encouraged by the robust efficacy results, the preliminary safety data in individual Phase III studies and the ongoing pool efficacy and safety analyses**." (Emphasis added).

60.     On February 28, 2019, Defendant Cotroneo sold 14,787 shares of FibroGen stock, reaping approximately $888,000 in proceeds while in possession of material non-public information related to Roxadustat's approval prospects. He also sold 7,665 shares and 3,201 shares on March 19 and June 18, 2019, respectively, for total proceeds of approximately $562,000.

61.     Defendant Chung began to sell stock at inflated prices on May 7 and May 8, 2019, for total proceeds of approximately $522,000.

62.     Defendant Schoeneck sold 6,000 shares on March 7, April 8, and May 7, 2019, for total proceeds of approximately $309,000.

21

63. Defendant Yu sold 9,145 shares on March 14, 2019 for total proceeds of approximately $514,000.

64. Defendant Kurkijärvi sold 14,000 shares between April 8, 2019 and May 8, 2019 for total proceeds of more than $680,000.

65. Defendant Neff sold 158,544 shares between March 6, 2019 and April 18, 2019, for total proceeds over $8.4 million.

***May 9, 2019 Press Release***

66. On May 9, 2019, FibroGen issued a press release, announcing "Positive Topline Results From Pooled Safety Analyses of Roxadustat Global Phase 3 Program" (the "May 2019 Press Release"). In that press release, the Company claimed that (i) there was "no clinically meaningful difference in [MACE] risk" between the two treatment arms for dialysis-dependent and non-dialysis dependent patients; (ii) Roxadustat had achieved superiority in the time to first MACE+ versus Epogen in incident dialysis patients; and (iii) there was "a trend toward reduced [MACE] risk for patients on [R]oxadustat compared to Epogen." The May 2019 Press Release further stated that "ITT [intention-to-treat]" method was "among the several statistical methods that we will discuss with the FDA," and that "[i]n these analyses, Roxadustat was comparable based on a commonly applied non-inferiority margin of 1.3."

67. The May 2019 Press Release also quoted Defendant Yu as stating that "[w]e are particularly excited about the results indicating a reduction of risk of MACE+ events in incident dialysis patients." Defendant Neff added:

> We are very pleased with what we believe are **important positive results of MACE and MACE+ analyses in the dialysis-dependent, incident dialysis, and non-dialysis dependent CKD patients, supporting the safety of Roxadustat in CKD patients...these positive safety data give us confidence as we progress in preparation for the U.S. NDA...**

(Emphasis added).

68.     The May 2019 Press Release further quoted Defendant Neff as touting certain Roxadustat efficacy results, namely a "reduction of transfusion, and the encouraging results from the pooled analyses of Quality of Life." Similarly, Defendant Yu was quoted as touting the "additional potential clinical benefits of Roxadustat," including data concerning purported "**improvement of quality of life,**" which the press release claimed was "statistically significant" in non-dialysis dependent patients. (Emphasis added).

### May 9, 2019 Conference Call

69.     Also on May 9, 2019, the Company held its first quarter earnings call for 2019. In response to analyst questions about the meaning of the "clinically meaningful" statement, Defendant Neff stated that it "mean[t] that [Roxadustat **met the safety standards that people were looking for and that's why people are moving forward**" and "**the message there is we're trending favorably.**" Defendant Neff and Defendant Yu also further emphasized the purported numerical advantage in MACE+ of Roxadustat versus Epogen, asserting that in "**[e]very one of [the MACE+ categories]**" – which they explained encompassed all MACE events – "we have a numeric advantage over [Epogen]… Fewer events in Roxa versus ESA in deaths. Fewer events in Roxa versus ESA in myocardial infarction. Fewer strokes in Roxa than ESA. Fewer unstable angina hospitalizations. Fewer congestive heart failures resulting in hospitalizations." (Emphasis added).

70.     On the May 9, 2019 earnings call, Defendant Yu continued to tout the Roxadustat results in the non-dialysis dependent and incident dialysis groups in particular. For non-dialysis dependent patients, Defendant Yu stated that "**because our drug is so efficacious and so well tolerated, patients really like staying on our drug,**" and that, under the purportedly "conservative" ITT analysis, "**the fact that . . . we are able to show non-inferiority to placebo**

**under such conditions**" – which Yu stressed was "**the gold standard for safety**" – "**really illustrates the strength of our drug's safety.**" For incident dialysis patients, Defendant Yu emphasized that Roxadustat had "superior" safety to Epogen on the MACE+ endpoint by a statistically significant margin, stating "**that we are superior in time to MACE+ analysis in incident dialysis**," meaning that "**the upper bound of the 95% confidence interval is less than 1,**" such that "when you compare the hazard between Roxadustat to that of [Epogen], **we have a very significant p value.**" (Emphasis added).

71.     Furthermore, in response to a question from noted biotech analyst Dr. Porges seeking "reassurance" regarding the "number of deaths, MIs and strokes" (i.e., MACE events) in the overall dialysis-dependent patient population as opposed to the incident dialysis subpopulation, Defendant Yu replied, "**we are quite comfortable with the safety result when looking at MACE and MACE+**" and verified that the rates of events in each of the MACE and MACE+ categories were at least comparable as between Roxadustat and Epogen. Specifically, Defendant Yu stated: "**[W]hen we tested time to—for example, MACE+ and MACE, Roxadustat was at least non-inferior to [Epogen] even in the conversion stable dialysis patients.**" (Emphasis added).

72.     Additionally, during the May 9, 2019 earnings call, Defendants Neff and Yu repeatedly asserted, in response to analysts' questions, that they were confident in FDA approval due to Roxadustat purportedly achieving statistical non-inferiority using the non-inferiority margin of 1.3. For example, in response to analyst questions regarding the FDA prespecified analysis, Defendant Neff stated that the Company felt the ITT results were what "**describe[ed] the situation most effectively,**" and asserted that an upper bound on the hazard ratio of 1.3 under the ITT analysis was the "**safety evaluation standard the FDA usually asks for**":

> **[I]n thinking about how to describe the situation most effectively, we decided to describe the ITT results. This is MACE, MACE+, MACE CV, time to MACE+, time to MACE . . . And in each case, the result of the analysis was at a [hazard] ratio of below 1.3, which is a standard non-inferiority comparison in ITT…**

(Emphasis added).

73.     Defendant Yu also emphasized this point later in the call, in response to a direct analyst question about whether Roxadustat had achieved statistical non-inferiority on the FDA's MACE endpoint:

> **[W]e are using the conventional standards of noninferiority, which is widely published for assessment of chronic kidney disease anemia and have previously been used by [the FDA] for assessment of cardiovascular safety in similar types of composite endpoints…that standard has been 1.3 for upper bound of 95% confidence interval. If we use that standard, the answer is yes, we have achieved non- inferiority.**

(Emphasis added).

74.     Finally, when directly asked by an analyst whether FibroGen believed it would avoid the dreaded "black box" warning on Roxadustat's label based on the MACE safety data, Defendant Yu responded: "[B]ased on what we have seen, **we are pretty comfortable with safety**. The adjudicated **composite safety endpoint was something that we have discussed with the FDA**." (Emphasis added).

***May 9, 2019 Form 10-Q***

75.     Also on May 9, 2019, FibroGen filed its quarterly report on Form 10-Q for the first quarter of 2019 (the "1Q2019 10-Q"), which was signed and certified by Defendants Neff and Cotroneo. In the 1Q2019 10-Q, the Company reiterated the topline MACE safety results set forth in the May 2019 Press Release. Specifically, for dialysis-dependent patients, the 1Q2019 10-Q again stated that "[f]or the U.S., where the focus will be on MACE, based on the collective results of the various MACE analyses, we believe there is no clinically meaningful difference in

MACE risks between roxadustat and epoetin alfa." For incident dialysis, "there was a trend toward reduced risk of MACE for patients on roxadustat, compared to epoetin alfa." For non-dialysis dependent, "[f]or the U.S., where the focus will be on MACE, based on the collective results of the various MACE analyses, we believe there is no clinically meaningful difference in MACE safety between roxadustat and placebo in this same non-dialysis population."

76.    The Insiders continued to dump stock. On June 6, 2019, Defendant Kurkijärvi sold 6,000 shares for total proceeds of more than $225,000. Defendant Neff sold 127,450 shares between May 13, 2019 and June 6, 2019 for total proceeds over $4.6 million.

*June 12, 2019 Goldman Sachs 40th Annual Global Healthcare Conference*

77.    On June 12, 2019, FibroGen participated in the Goldman Sachs 40th Annual Global Healthcare Conference. During the conference, the Individual Defendants continued to make unequivocally positive (and false) statements regarding the safety and efficacy of Roxadustat. For example, Defendant Yu once again touted Roxadustat's Phase 3 trial results and the "compelling evidence confirming [R]oxadustat's cardiovascular safety to support our regulatory filings." Defendant Yu further reiterated that "our MACE results in dialysis and in non-dialysis also support the conclusion of no increased cardiovascular safety risk." Defendant Yu also "emphasize[d] [the] MACE+ superiority in [the] incident dialysis pool," and touted certain "efficacy benefits" of Roxadustat, including "transfusion reduction" and "improvement in quality of life."

78.    Defendant Neff added that the Company was "in a place now **where we have safety data and efficacy data that's superior to [Epogen] in a U.S. setting**" and specifically emphasized how Roxadustat was "differentiated" from the competition because it was just as safe as placebo and due to its "outstanding" results in the critical incident dialysis population:

In the U.S., there are a couple of factors related to how we've differentiated ourselves and I think in one respect doing the work to do [a] placebo study in chronic kidney disease and show that we are as safe as the placebo control arm is a very exciting place to be for purposes of trying to build a marketplace . . . And in the dialysis setting.

. . we've ended up creating a pool of almost 1,600 patients in an incident dialysis setting . . . **we've had outstanding results in this area**. We think it's the most fair comparison of [Epogen] to Roxa. **We think it opens the door to Roxa being recommended as a first medicine . . . [I]t looks very, very promising at this point.**

(Emphasis added).

79.     Defendant Neff also asserted that, based on the MACE data the Company had seen, Roxadustat "shouldn't have a 'Black Box'" warning:

[A] key goal in the U.S. was—with chronic kidney disease population, a placebo study was to show non-inferior to placebo, to show that there isn't any incremental risk measure so that it opens the door to the logic [that Roxadustat] shouldn't have a 'Black Box' for placebo. Therefore, **Roxa should not have a 'Black Box' and go from there in dealing with dialysis. And it's turned out as we hoped for.**

(Emphasis added).

80.     Shortly thereafter, between June 18, 2019 and July 11, 2019, Defendant Chung dumped 22,500 shares of FibroGen stock, reaping over $1 million in total proceeds. Defendant Yu sold 3,420 shares on June 14, 2019, reaping more than $140,000 in total proceeds. Defendant Kurkijärvi sold 12,000 shares on July 8 and August 5, 2019, collectively reaping over $526,000. Finally, between June 19, 2019 and July 25, 2019, Defendant Neff sold 118,908 shares of his stock in the Company, reaping over $5.3 million in total proceeds.

***August 8, 2019 Conference Call***

81.     On August 8, 2019, FibroGen held a conference call with analysts and investors to discuss the Company's results for the second quarter of 2019. On that call, Defendant Neff announced that Company had "**reached an agreement with the [FDA] on the content of the NDA including the cardiovascular safety analysis.**" Defendant Yu then emphasized

Roxadustat's MACE safety results, stating that "**Phase 3 results confirmed the cardiovascular safety of [R]oxadustat.**" Defendant Yu further touted FibroGen's interactions with the FDA, highlighting that the Company had a "very good pre-NDA meeting with the FDA on [R]oxadustat" where FibroGen and the FDA reached an agreement "on our proposed pooled MACE analysis." Defendant Yu also claimed that FibroGen was "**very pleased with the agreement [with the FDA] on the primary safety analysis of our primary cardiovascular safety endpoint in NDD.**" (Emphasis added).

82.     In response to an analyst question about whether FibroGen had "confidence around the statistics" in light of the agreement reached with the FDA, Defendant Yu expressed FibroGen's "confidence on non-inferiority of MACE," stating that the Company's "level of confidence is very high, and we do believe . . . that our Phase 3 results confirm cardiovascular safety of [R]oxadustat in the chronic kidney disease population in both dialysis and non-dialysis."

***August 8, 2019 Form 10-Q***

83.     Also on August 8, 2019, FibroGen filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2019 (the "2Q2019 10-Q"), which was signed and certified by Defendants Cotroneo and Neff. The 2Q2019 10-Q stated that the Company

> reached agreement on the content to be included in our NDA submission package for Roxadustat for treatment of anemia in chronic kidney disease, including the cardiovascular safety analyses for both chronic kidney disease-dialysis and chronic kidney disease-non-dialysis. The agreement for non-dialysis is an approach to account for the differential dropout between roxadustat and placebo observed in our Phase 3 studies. We are confident we have sufficient data for FDA review of our NDA in both chronic kidney disease dialysis and chronic kidney disease non-dialysis and we are planning to submit the NDA in October of 2019.

84.     On September 17, 2019, while the Individual Defendants continued to conceal material information from the investing public, Defendant Cotroneo sold 3,201 shares of

FibroGen stock, reaping over $132,000 in total proceeds. Defendant Chung sold 33,750 shares from August 22 until October 9, 2019, reaping over $1.3 million in total proceeds. Defendant Yu sold 3,419 shares on September 16, 2019, reaping more than $139,000 in total proceeds. Defendant Kurkijärvi sold 18,000 shares between September 9, 2019 and November 7, 2019, reaping over $695,000 in total proceeds. Between August 12, 2019 and August 22, 2019, Defendant Neff sold 79,272 shares of FibroGen stock, reaping more than $3.5 million in total proceeds based on his possession of material, non-public information regarding the Company.

***November 8, 2019 Press Release***

85.     On November 8, 2019, FibroGen issued a press release (the "November 2019 Press Release") announcing "Positive Phase 3 Pooled Roxadustat Safety and Efficacy Results" that had been presented at the American Society of Nephrology Kidney Week 2019. In the November 2019 Press Release, which was also filed with the SEC on Form 8-K, FibroGen announced that (i) "**Roxadustat cardiovascular safety [was] comparable to placebo in [NDD] patients**" under MACE; (ii) it "did not increase risk of MACE and reduced risk of MACE+ compared to [Epogen]" in dialysis-dependent patients; and (iii) it purportedly "**reduced risk of MACE by 30% and MACE+ by 34% compared to [Epogen]**" in the crucial incident dialysis population. (Emphasis added).

86.     The November 2019 Press Release also announced MACE hazard ratios. Specifically, the Company reported **a MACE hazard ratio of 0.96** (95% confidence interval, 0.82 to an upper bound of 1.13) for dialysis-dependent patients; a MACE hazard ratio of 1.08 (95% confidence interval, 0.94 to an upper bound of 1.24) in non-dialysis dependent patients; and a MACE hazard ratio of 0.70 (95% confidence interval, 0.51 to an upper bound of 0.96) in incident dialysis patients. The November 2019 Press Release proclaimed that, in total, "**[t]he**

29

**pooled safety analyses. . . demonstrate a cardiovascular safety profile comparable with placebo in [NDD] patients, and comparable or in some cases better than that of [Epogen] in patients on dialysis.**" (Emphasis added).

87.     The November 2019 Press Release also purported to expressly clarify that for non-dialysis dependent patients, the results were based on the "**ITT analysis agreed with the FDA**" and that the "[r]isks of MACE, MACE+, and all-cause mortality in Roxadustat patients were comparable to placebo in the ITT analyses based on a reference non-inferiority margin of 1.3." In the dialysis-dependent patient population, the November 2019 Press Release stated that "[r]isks of MACE and all-cause mortality in Roxadustat patients were not increased compared to those for patients receiving [Epogen] based on a **reference non-inferiority margin of 1.3**" and further claimed that "[r]isk of MACE+ was 14% lower in Roxadustat-treated patients than in those receiving [Epogen.]." Finally, for the crucial incident dialysis population, the November 2019 Press Release stated that the "[r]isk of MACE was 30% lower in Roxadustat patients than in epoetin alfa patients, and risk of MACE+ was 34% lower." (Emphasis added).

### *November 11, 2019 Conference Call*

88.     On November 11, 2019, FibroGen held a conference call with analysts and investors to discuss the Company's results for the third quarter of 2019. During that call, Defendant Schoeneck, the Company's Interim CEO at the time, following former CEO Neff's passing, reaffirmed that Roxadustat's "**cardiovascular safety was comparable to placebo in [NDD] patients**"; "in [DD] patients, **roxa[] did not increase the risk of MACE and reduce[d] the risk of MACE+ compared to [Epogen]**"; and in "incident dialysis patients, **roxa[] reduced MACE by 30% and MACE+ by 34% compared to [Epogen],**" which was purportedly "**unlike anything currently on the market in the U.S. or Europe.**" (Emphasis added).

89.     During the call, Defendant Yu responded to specific questions regarding recent "investor concern about FDA agreements and FDA signoff," and reassured investors by stressing that the Company had "a very productive dialogue with the FDA on the analysis of cardiovascular safety" and "walking out of [the pre-NDA meeting with the FDA], we felt that we had all the guidance from the FDA we needed to put together a winning submission." When further pressed by analysts on the call about whether she had any concern "about the hazard ratios and the upper bounds" the Company had presented, Defendant Yu responded that she had "no concern about that" and that FibroGen was "very comfortable with our data where it is now." Later, when Defendant Yu was directly asked again about whether the FDA had signed off on the analyses the Company had presented, she responded by unequivocally confirming that the Company's publicly announced results were based on:

> the **agreed analysis plan that we have made with the FDA**…So the answer to that question is that we had already talked with the FDA about [the] analytical plan, and we had made the agreement on the analysis plan. **The results that we have presented in the high-impact clinical session at the ASN, and the numbers I had just presented, were based on the agreed upon analysis plan that we have made with the FDA . . . [W]e are confident that we do have what it takes for this drug to be favorably evaluated.**

(Emphasis Added).

90.     The Individual Defendants' reassurances that the positive Roxadustat MACE results the Company had presented were the result of the pre-specified analyses they had agreed upon with the FDA had their intended effect. Leading up to FibroGen's submission of the Roxadustat NDA in December 2019, FibroGen's stock price increased by more than 22%, from $37.01 on November 4, 2019 to $45.30 on December 20, 2019.

***November 12, 2019 Form 10-Q***

91.     On November 12, 2019, the Individual Defendants filed with the SEC FibroGen's quarterly report on Form 10-Q for the third quarter of 2019 (the "3Q2019 10-Q"), which was

signed and certified by Individual Defendants Schoeneck and Cotroneo. The 3Q2019 10-Q claimed that the Company's "cardiovascular safety analysis reflects the pooling strategy and analytical approach we agreed on with the FDA." The 3Q2019 10-Q added that, in FibroGen's pre-NDA meeting with the FDA:

> the FDA agreed that the ITT-analysis would be our primary cardiovascular safety analysis method for non-dialysis in the U.S. as it uses on-treatment and post-treatment long term follow-up (until a common study end date) to account for the higher drop-out rate in the placebo arm. The figure below shows that in the 4,270 pooled non-dialysis patients (OLYMPUS, ANDES, and ALPS), the risk of MACE, MACE+, and all-cause mortality in Roxadustat patients were comparable to that in placebo patients based on a reference non-inferiority margin of 1.3.

92.     Shortly thereafter, before the truth was revealed to the public, Defendant Cotroneo sold 59,456 shares of FibroGen stock on December 20, 2019, reaping over $2.7 million in total proceeds. Between November 13, 2019 and February 12, 2020, Defendant Chung sold 45,000 shares of the Company's stock, reaping over $1.9 million in total proceeds. On December 16, 2019, Defendant Yu sold 3,420 shares, reaping more than $159,000 in total proceeds. Similarly, Defendant Kurkijärvi sold 18,000 shares between December 9, 2019 and February 10, 2020, reaping over $797,000 in total proceeds.

***February 25, 2020 SVB Leerink Global Healthcare Conference***

93.     On February 25, 2020, Defendant Conterno presented at the SVB Leerink Global Healthcare Conference, where he made a series of false statements touting the purported safety of Roxadustat. For example, Defendant Conterno stated that "the [Roxadustat] data that we have on cardiovascular safety is very compelling." He then went on to say that, "when we look at the data, basically – we basically show to be comparable to placebo" and noted that "our data [is] extremely clean … from my perspective when it comes to cardiovascular safety." Defendant Conterno emphasized that "we have a trial that, in my view, basically, shows safety against what I think is a very high hurdle of placebo." He further asserted that, based on his review of the data,

"I do not believe that the data warrants a 'Black Box'" warning, and while not receiving the warning would require Roxadustat to meet "a pretty high standard," Defendant Conterno was "very excited and delighted with the results that we got . . . out of cardiovascular safety." Defendant Conterno further asserted that, based on the only guidance the Company had purportedly received from the FDA, which was for diabetes, there was "a 1.3 upper bound" for non-inferiority, and "when we looked at the pooled analysis...we do basically see hazard ratios, about 1—slightly higher than 1, but the upper bound in each one of these cases, is below 1.3."

***March 2, 2020 Conference Call***

94.    On March 2, 2020, FibroGen reported financial results for the fourth quarter and full year of 2019. Once again, the Individual Defendants boasted about the safety and efficacy of Roxadustat. For example, during FibroGen's March 2 analyst call, Defendant Yu stated that "[R]oxadustat can potentially better address chronic kidney disease anemia than what is currently available to chronic kidney disease patients on dialysis and those not on dialysis" due to "the robust efficacy and safety profile demonstrated." In particular, Defendant Yu referenced the purported "lower transfusion risk than [Epogen] patients, while lowering MACE+ risk in the dialysis patient pool" and highlighted that FibroGen was "particularly excited about the cardiovascular safety results of the incident dialysis population," which purportedly "demonstrated a meaningful reduction in cardiovascular safety risk, as Roxadustat-treated incident dialysis patients had a 30% lower MACE risk and a 34% lower MACE+ than [Epogen]-treated patients." Defendant Yu further stated that, "with respect to cardiovascular safety, Roxadustat was comparable to placebo in risk of MACE and MACE+" and that "we have designed a program to demonstrate safety in comparison to placebo and with the hope and confidence of gaining clean safety label for non-dialysis." FibroGen reiterated these results in its

Form 10-K for the year ended December 31, 2019, filed the same day, which was signed by Individual Defendants Conterno and Cotroneo.

95.     Days later, on March 16, 2020, Defendant Cotroneo sold 9,239 shares of FibroGen stock, reaping over $243,000 in total proceeds. Defendant Chung sold 11,250 shares on March 18 and March 19, 2020, reaping more than $287,000 in total proceeds. Defendant Kearns also sold 18,000 shares on March 19, 2020, reaping over $417,000 in total proceeds.

*May 7, 2020 Conference Call*

96.     On May 7, 2020, FibroGen held a conference call to discuss the Company's financial results for the first quarter of 2020. Regarding Roxadustat safety, Defendant Yu stated that:

> Importantly, we have demonstrated cardiovascular safety in the overall dialysis population and in MACE...In our 1,530-incident dialysis patient pool, where the comparison between Roxadustat with epoetin alpha started within the first 4 months of dialysis initiation, Roxadustat had a 30% lower risk of MACE and 34% lower risk of MACE+ than [Epogen], with a trend towards lower or cause mortality, relative to [Epogen].

97.     With respect to dialysis-dependent patients, Defendant Yu stated that, "looking at safety -- cardiovascular safety, it does not change any of the conclusions that we have on the -- about Roxadustat being safe and efficacious." With respect to NDD patients, Defendant Yu asserted that "placebo is the gold standard. With -- in comparison to placebo, we have demonstrated that cardiovascular safety in the MACE endpoint and MACE+ endpoint." Defendant Yu further stated:

> [I]n conclusion, Roxadustat, excellent cardiovascular safety profile, coupled with the statistically significant and clinically meaningful, higher hemoglobin efficacy results and lower transfusion rate relative to epoetin alfa, together makes Roxadustat potentially a better treatment option for dialysis-dependent patients. We like the hand that we have and expect the product label to reflect the results of clinical trials on our compound.

*May 14, 2020 Bank of America Securities 2020 Health Care Conference*

98.     On May 14, 2020, FibroGen participated in the Bank of America Securities 2020 Health Care Conference. During the conference, Defendant Conterno stated that "lower transfusions," the "compelling" "overall cardiovascular data", and the "quite meaningful" results in the incident dialysis population differentiated Roxadustat from its competitors:

> [A]s I think about the differentiation of Roxa, number one, I think you have to start with efficacy . . . We actually had lower transfusions with Roxa than with [Epogen] . . . So that benefit to me, I think, is pretty significant. Clearly, in the— when we look at the totality of the data, I find our overall cardiovascular data pretty compelling. And in particular, I think we need to highlight the incident dialysis data, whereby we basically show a reduction in risk of MACE events at a time that is critical. And this is—incident dialysis, basically, covers those patients within the first 4 months of starting dialysis. That is the time when a treatment decision is made when it comes to anemia . . . So that I find also quite meaningful. And clearly the data is highly—it was—compared to [Epogen], it's highly differentiated based on what we can see.

### June 2, 2020 Jefferies 2020 Healthcare Conference

99.     On June 2, 2020, the Company participated in the Jefferies 2020 Healthcare Conference. At the conference, with respect to Roxadustat, Defendant Conterno again touted the Company's "data," without disclosing the highly material fact that FibroGen had improperly manipulated that data to make the drug appear safer and more effective than it really was:

> [W]hen we look at our data, I feel it basically shows that the product is safe because of the safety profile when it comes to CV comparable to placebo . . . [I]n [DD], when it comes to incident dialysis, we do show an actual significant benefit, well, with a 30% reduction in MACE . . . When I put those two reasons together, I look at the compelling nature of our data, and I feel that . . . there's no warrant [for a] Black Box . . .

### June 4, 2020 Annual Meeting of Stockholders

100.    On June 4, 2020, FibroGen held its 2020 Annual Meeting of Stockholders. Defendant Conterno stressed to investors the importance of the MACE safety results in incident dialysis patients, stating:

> Importantly, CV safety was demonstrated across all studied populations. Non-

dialysis-dependent, incident dialysis and dialysis dependent... In incident dialysis patients, Roxadustat reduced risk of major adverse cardiovascular events or MACE by 30%. And reduce[d] the risk of MACE+ by 34% compared to [Epogen]. Both results were statistically significant . . . Roxadustat clearly provides a large clinical benefit in the incident dialysis patient population, and we believe this is a natural decision point for health care professional[s] when selecting which therapeutic agent will be utilized in the treatment of anemia.

***June 9, 2020 Goldman Sachs 41st Annual Global Healthcare Conference***

101.     On June 9, 2020, FibroGen participated in the Goldman Sachs 41st Annual Global Healthcare Conference (the "June 2020 Goldman Conference"). During the conference, Defendant Conterno again emphasized the "huge" and "compelling" results in the incident dialysis population, which "differentiated" the drug:

I think as you know, I've been very excited about our incident dialysis data and the fact that we showed a 30% reduction in MACE risk and 34% when it comes to MACE plus. Honestly, that's huge and that's an anchor. Because as patients start dialysis, clearly part of that dialysis initiation is going to be treatment of anemia. And I believe that we have the very best data. It's quite compelling and differentiated.

102.     Defendant Conterno reiterated at the June 2020 Goldman Conference that Roxadustat had "showed a significant benefit when it comes to MACE in [the incident dialysis] population, 30% reduction in MACE," which was an "unbelievable result" and "probably the most compelling data that we have." He further represented that "given that [FibroGen] showed [Roxadustat had] basically comparable safety to placebo" – which was "very difficult to achieve" – the Company had "the very best chance basically to have a label without a 'Black Box.'"

103.     Continuing to dump FibroGen shares before material, non-public information was ultimately revealed to the market, on June 16, 2020, Defendant Cotroneo sold 3,928 shares of the Company's stock, reaping more than $155,000 in total proceeds. Defendant Yu sold 3,351 shares on July 24, 2020, reaping more than $141,000 in total proceeds.

*August 6, 2020 Conference Call*

104.    On August 6, 2020, FibroGen held a conference call with investors, during which Defendant Conterno discussed the FDA's review of Roxadustat, stating that the Individual Defendants continued to expect an FDA decision on the Roxadustat NDA by the PDUFA date of December 20, 2020, and that the FDA had indicated that an advisory committee meeting was not planned at that time. While Defendant Conterno stated that, moving forward, there would be no public discussion regarding labeling, he noted that, "clearly, we view that Roxadustat will be successful -- I think I've mentioned this to you and others in the past, very successful regardless… We continue to view that our data shows a very positive benefit-risk profile for the product." Defendant Conterno added: "our engagement and our interaction with the FDA was positive. So we feel good about the progress that we are making."

*August 6, 2020 Form 10-Q*

105.    Also on August 6, 2020, FibroGen filed its quarterly report on Form 10-Q for the second quarter of 2020 (the "2Q2020 10-Q"), which was signed and certified by Individual Defendants Conterno and Cotroneo. The 2Q2020 10-Q stated that "the Company received positive topline results from analyses of pooled MACE and MACE+ data from its Phase 3 trials for Roxadustat, enabling the Company's NDA submission to the FDA."

106.    The next day, Defendant Cotroneo sold 22,554 shares of FibroGen stock and, on September 3, 2020, he sold another 15,004 shares, reaping over $1.7 million in total proceeds. On September 3, 2020, Defendant Yu sold 10,000 shares of FibroGen stock for total proceeds of more than $508,000.

*September 9, 2020 Citigroup 15th Annual BioPharma Conference*

107.    On September 9, 2020, FibroGen participated in the Citigroup 15th Annual BioPharma Conference, during which a Citigroup analyst asked how investors should think about Roxadustat in light of a competitor's negative safety results released the prior week. Specifically, competitor Akebia's anemia drug, Vadadustat, had failed to show non-inferiority in the non-dialysis dependent group compared to ESAs, with a hazard ratio above 1.25.

108.    Defendant Conterno responded by reaffirming Roxadustat's MACE results in the non-dialysis dependent population, citing "the significant level of evidence that we have already with Roxadustat around NDD," and noting that the Company was "able to show non-inferiority relative to placebo, which is a higher bar than a comparison to a product that had – or product [that has] box warnings. So we feel very good about our pool MACE data in NDD." Defendant Conterno further stated that the Company's "excellent data" did not warrant a "Black Box" warning, and that FibroGen's engagement with the FDA on the issue was positive:

> I think what I can say is we feel very good about where we are in terms of the review with the FDA, the level of engagement that we have. I know this question about a [Black Box] warning comes often, which is are going to get one or not . . . But we feel very good about the level of energy that we have. I think what I've said before is that we have excellent data. We don't believe that the data that we have warrants a [Black Box] warning.

109.    Continuing to sell off shares based on material, non-public information, on September 15, 2020 and September 16, 2020, Defendants Cotroneo and Yu sold 3,070 shares and 3,351 shares of FibroGen stock, respectively, together reaping nearly $300,000 in proceeds.

***November 5, 2020 Conference Call***

110.    On November 5, 2020, FibroGen held a conference call with investors during which Defendant Conterno stated that the "Roxadustat clinical data demonstrated consistent efficacy and reassuring safety results across the continuum of chronic kidney disease patients with anemia." Regarding non-dialysis dependent patients, Defendant Conterno stated that

Roxadustat "has the right efficacy safety profile to be able to have a really good uptake in the non-dialysis dependent setting and be able to be a catalyst for the overall expansion of that market." Further discussing non-dialysis dependent patients, Defendant Conterno told investors that "I think what's important is when -- first, when we look at the overall trial, we basically see that in non-dialysis dependent, we were comparable to placebo. So that's when it comes to MACE. So that's critically important. We showed non- inferiority." Regarding incident dialysis patients, Defendant Conterno stated, "I think if we think about straight off the bat, in incident dialysis, the excellent data that we have with – showing basically reduced cardiovascular outcomes in this population, so that's extremely important."

***November 17, 2020 Stifel 2020 Virtual Healthcare Conference***

111.   On November 17, 2020, FibroGen participated in the Stifel 2020 Virtual Healthcare Conference. During the conference, analysts queried whether it was a positive sign that the FDA had never convened an Advisory Committee to review the Roxadustat NDA. In response, Defendant Conterno cited FibroGen's "very compelling" data, which the Company had previously shared with the FDA, that had "[c]learly . . . demonstrated both the efficacy and the safety" of Roxadustat:

> Given the chance of an FDA Advisory Committee Meeting, we had to prepare for one but that's really water under the bridge… at this stage, I think what I can say is basically we have to rely on the data that we've shared. And I feel that the data that we shared, I think is very compelling when it comes to Roxadustat…the broad safety data that we have first thing in dialysis-dependent where we look at both our safety data there when we compare to ESAs. As you know we had pretty compelling data when it comes to incident dialysis we had statistics in terms of a reduction in the number of MACE events in that setting. And then when we look at NDD, we were compared to placebo and we basically had comparability when it comes to overall safety. So, feel very good about the overall package that we had . . . Clearly we've already said and have demonstrated both the efficacy and the safety of the product.

***November 19, 2020 Jefferies Virtual London Healthcare Conference***

112.    On November 19, 2020, FibroGen participated in the Jefferies Virtual London Healthcare Conference. As he had during the Stifel conference two days earlier, Defendant Conterno told investors: "Clearly, we have a high level of conviction on the overall submission, the strength of our data…" Defendant Conterno reiterated, "Clearly, I think the -- when we look at our data, we continue to feel that the data basically offers a very favorable risk-benefit profile for patients across the continuum." Defendant Conterno also stated that, where ESAs are not working very well, "Roxadustat will be an excellent option there, okay? What about the incident dialysis population, where we basically showed a very significant benefit when it comes to MACE and MACE+."

***November 2020 FDA Citizen Petition***

113.    In mid-November 2020, an FDA Citizen Petition[4] (the "Citizen Petition") was filed requesting that the FDA decline approval of Roxadustat pending more data demonstrating that the drug's benefits outweighed the risks and asking for a "black box" warning indicating that the MACE risk was similar to the dangers of Epogen. Foreshadowing the negative information soon to be revealed about the Company, the Citizen Petition further alleged that the Individual Defendants' presentation of the detailed MACE safety data at the November 8, 2019 ASN conference had improperly "disguised" significant safety concerns for Roxadustat.

***December 1, 2020 Yu's "Retirement"***

114.    On December 1, 2020, FibroGen abruptly announced the sudden "retirement" of its Chief Medical Officer, Defendant Yu, who would be replaced by Defendant Eisner. Thus, while allegedly close to regulatory approval for its key drug after years of development, the Company pushed out its Chief Medical Officer who was directly responsible for this very data,

---

[4] An FDA Citizen Petition is a process provided by the FDA whereby individuals and community organizations can provide input on the FDA's evaluation of NDAs.

under highly suspicious circumstances. Defendant Yu did not stay "retired" for very long. She took a new position at a different company just three months later, on March 9, 2021.

115.    The above statements were materially false and misleading when made because Roxadustat's true data failed to support FDA approval in any patient population at all, which would effectively lead to the failure of its FDA approval prospects. As previously noted in ¶¶ 55-56, 59, 66-67, 69-78, 81-83, 85-86, 88-89, 91, 93-94, 96-97, 99-100, 102, and 110-111 *supra*, the Individual Defendants either falsely touted or failed to correct other Individual Defendants' false statements that Roxadustat's efficacy and safety were superior to Epogen and just as safe as the placebo. As previously noted in ¶¶ 55-56, 58-59, 66-70, 72, 74-75, 78-79, 81, 83, 86-87, 89, 91, 93, 98-99, 101-102, 104-105, 108, and 110-112 *supra*, the Individual Defendants either falsely assured or failed to correct other Individual Defendants' false statements that Roxadustat's safety data was derived from FDA approved analyses. Accordingly, the Individual Defendants' positive statements about the Company's business operations and prospects, as well as the likelihood that the NDA for Roxadustat would earn FDA approval, were materially false and misleading throughout the Relevant Period.

116.    In the wake of Defendant Yu's "retirement," and mere days before the truth finally began to emerge and the stock price started to plummet, Defendant Cotroneo sold 3,068 shares of FibroGen stock on December 15, 2020, reaping over $133,000 in total proceeds. Defendant Yu continued to take advantage of her adverse material nonpublic information after her retirement was announced, selling 3,350 shares of FibroGen stock on December 16, 2020 for total proceeds of approximately $139,000.

**The Truth Begins to Emerge**

***December 18, 2020 Press Release***

117.     On December 18, 2020, just three weeks after Defendant Yu's unexpected "retirement," FibroGen issued a press release, after trading hours, announcing that the FDA had "extended the review period of the [NDA] for Roxadustat . . . by three months," with a new PDUFA date of March 20, 2021.

118.     On this news, the Company's stock price fell to $40.01 on December 21, 2020, a 9% decrease from the previous trading day's closing price of $43.97. Although the stock price fell, it was still inflated because the Individual Defendants continued to conceal the truth about Roxadustat.

119.     Defendant Kurkijärvi took advantage of this partial disclosure of the truth when he continued to sell FibroGen stock. Specifically, between December 28, 2020 and February 17, 2021, Defendant Kurkijärvi sold 24,000 shares of the Company's stock, reaping over $1 million in total proceeds.

### March 1, 2021 Announcement of FDA Advisory Committee

120.     On March 1, 2021, FibroGen issued a press release announcing that the FDA would hold an FDA Advisory Committee Meeting "to review the [NDA] for Roxadustat" on a date to be determined later. The fact that the FDA was requesting an FDA Advisory Committee Meeting so late in the regulatory approval process signaled a significant setback for the approval of Roxadustat.

121.     On this news, the stock price fell to $38.07 on March 2, 2021, a 24% decrease from the previous trading day's closing price of $50.53. Again, even though the stock had plummeted dramatically, the full truth had yet to be revealed regarding Roxadustat's efficacy and safety.

122.     In response to this development, rather than admit the truth, the Individual

Defendants continued to make false public statements asserting that they remained fully confident in Roxadustat's data and its prospects for FDA approval. For example, while FibroGen stated in its March 1, 2021 press release that it was "disappointed" with the news, Defendant Conterno was quoted as stating: "We continue to be confident in the efficacy and safety profile of [Roxadustat] based on positive results from a global Phase 3 program encompassing more than 8,000 patients."

***March 1, 2021 Conference Call***

123.   Also on March 1, 2021, FibroGen held an earnings call during which the FDA Advisory Committee Meeting was discussed, with the Company's new Chief Medical Officer, Defendant Esisner, stating: "We continue to have confidence in the completeness of our NDA submission, the strength of our data," and later adding that "we're very willing and able to have this discussion in public and present our data, which, as we alluded to before, we're quite confident in." Defendant Conterno added: "[T]he data that we have on incident dialysis, we believe, is some of our strongest data. As we think about MACE and MACE+ significance in that population. So clearly, very, very important data."

124.   Following the decline in the Company's stock price, the Individual Defendants attempted to reassure investors that Roxadustat's trial results remained sound, that its NDA submission was complete and strong, and that the drug was still on track for FDA approval. Specifically, during FibroGen's first quarter earnings call on March 1, 2021, Conterno assured investors that FibroGen "continue[d] to have confidence in the completeness of the NDA submission and the strength of the [R]oxadustat data" and that "[c]learly, the efficacy and safety of [R]oxadustat were established by the global Phase 3 programs." FibroGen's new Chief Medical Officer, Defendant Eisner, further emphasized that the Company was "very confident in

43

our data for both [NDD and DD] populations" as well, stating that "the data are the same today as they were yesterday . . . [s]o we continue to feel very confident in the data." Significantly, Defendant Conterno also continued to strongly highlight the blatantly false MACE results for the incident dialysis population in particular, stating "of course, the data that we have on incident dialysis, we believe, is some of our strongest data[,] [a]s we think about MACE and MACE+ significance in that population."

### March 2, 2021 41st Annual Cowen Healthcare Conference

125.    On March 2, 2021, Defendant Conterno participated in the 41st Annual Cowen Healthcare Conference. Defendant Conterno assured investors that there was no reason to be concerned despite the previous day's news regarding the FDA Advisory Committee Meeting, reiterating the Company's "confidence in the completeness of the NDA submission and the strength of the roxadustat data." Defendant Conterno called the FDA Advisory Committee Meeting "an opportunity to basically showcase, I think, the strength of our data, and we continue to have confidence on the strength of the data of Roxadustat across both dialysis-dependent and NDD." Defendant Conterno further asserted that the totality of the data for dialysis-dependent and non-dialysis dependent patients "supports -- the benefit risk profile." Defendant Conterno added: "I know because we've discussed in the past, and I think I've been pretty clear in terms of what has been agreed with the FDA and what hasn't been agreed with FDA. I think that's known."

126.    Taking advantage of this attempt to buoy the stock, Defendant Kearns sold 18,000 shares on March 11, 2021 reaping over $630,000 in total proceeds.

### April 6, 2021 Press Release

127.    On April 6, 2021, under the pressure of increased FDA scrutiny and the

approaching FDA Advisory Committee Meeting, FibroGen issued a press release (the "April 2021 Press Release") admitting that the Roxadustat safety analyses the Company had presented to investors had "included post-hoc changes to the stratification factors" that had dramatically altered the data and made Roxadustat appear much better and safer than it was.

128.    On this news, the Company's stock price fell to $19.74 on April 7, 2021, a 43% decrease from the previous trading day's closing price of $34.64.

129.    Despite the shocking admissions in the April 2021 Press Release, however, the Individual Defendants continued to staunchly maintain that the Roxadustat data was positive and that the drug would obtain FDA approval. For example, Defendant Conterno said in the April 2021 Press Release: "this does not impact our conclusion regarding the comparability, with respect to cardiovascular safety, of Roxadustat to [Epogen] in dialysis-dependent (DD) patients and to placebo in non-dialysis dependent (NDD) patients. **We continue to have confidence in Roxadustat's benefit risk profile."** The April 2021 Press Release also reiterated that "[t]hese analyses **do not change the Company's assessment that Roxadustat is comparable to placebo in non-dialysis dependent patients and to [Epogen] in dialysis dependent patients using MACE to measure cardiovascular safety.**" (Emphasis added).

### April 6, 2021 Conference Call

130.    Also on April 6, 2021, the Company held a special "Business Update Call" to discuss Roxadustat's true cardiovascular safety analyses. During the call, Defendant Conterno specifically attempted to rebut concerns regarding the cardiovascular safety of Roxadustat:

> Our conclusion regarding the comparability with respect to cardiovascular safety of Roxadustat to [Epogen] in dialysis-dependent patients and to placebo in nondialysis-dependent patients is not impacted. So let me be very clear. **We continue to have confidence in Roxadustat's benefit risk profile, and we're committed to working closely with the FDA to bring this important new treatment to patients living with anemia of chronic kidney disease.**

(Emphasis added).

131.   Defendant Eisner also stressed that "these analyses do not change the Company's assessment that Roxadustat is comparable to placebo in nondialysis-dependent patients and to [Epogen] in dialysis-dependent patients using MACE to measure cardiovascular safety."

132.   In response to another analyst inquiry from Dr. Porges regarding whether the upper bound of the confidence intervals that was pre-agreed with the FDA was 1.25 or 1.3 for noninferiority, Defendant Conterno stated that "**in non-dialysis, we basically show comparability relative to placebo. With regards to the 1 point to any measures of excess risk, you mentioned 1.25 or 1.3, I think I said in a number of different occasions that we do not have a pre-agreed non- inferiority margin with the FDA.**" Defendant Conterno further assured investors that the "critically important message" was that the conclusions:

> **have not changed from a safety perspective… But clearly, our conclusions when it comes, as I mentioned, to -- in NDD and DD that we're comparable to placebo in NDD and comparable in DD to EPO have not changed a from a safety perspective. I think that's a critically important message. When it comes to incident dialysis, the numbers continue to be quite positive.**

(Emphasis added).

133.   Defendant Eisner added that "the overall analysis are [*sic*] consistent with comparable safety to placebo in the NDD population and to ESA in the dialysis-dependent population. And overall, we feel very good about the overall benefit-risk profile of the drug." Further, in response to an analyst inquiry regarding Roxadustat's safety profile, Eisner reiterated that "still, the overall results are very comparable in the NDD population to – for Roxadustat to placebo and in the DD and the incident dialysis subpopulation, comparable to ESA's in terms of cardiovascular safety. So overall, we continue to believe that the benefit risk profile of Roxadustat is favorable." Defendant Eisner also stressed that they could "clearly state that the

results with the prespecified stratification factors continue to support comparable cardiovascular safety between [R]oxadustat and placebo and a positive benefit risk profile." Ultimately, Defendant Eisner concluded that "[**a**]**t the end of the day, we do believe that the benefit/risk profile of roxadustat is positive and that the review will likely conclude that.**" (Emphasis added).

### May 10, 2021 Conference Call

134.    On May 10, 2021, FibroGen held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2021. During the call, Defendant Conterno stated that the *post hoc* update the Company had provided on April 6, 2021 "**does not impact our overall conclusions regarding the comparability with respect to cardiovascular safety of Roxadustat to [Epogen] in [DD] patients and to placebo in [NDD] patients.**" Defendant Conterno stressed that he "**want[ed] to reiterate that we continue to have confidence in the Roxadustat data and in the safety and efficacy profile demonstrated in the Phase 3 program.**" (Emphasis added).

### May 13, 2021 Bank of America Annual Healthcare Conference

135.    On May 13, 2021, Defendant Conterno participated in the Bank of America Annual Healthcare Conference (the "May 2021 Conference"). During the May 2021 Conference, Defendant Conterno stressed that Roxadustat was "**comparable on both dialysis dependent and non-dialysis dependent comparable to ESAs on dialysis dependent onto placebo on non-dialysis dependent**" and "can be an ideal choice there given the strength of our data, in particular in incident dialysis." He assured investors that he was "**quite confident on what Roxadustat can deliver,**" and added that, "**when it comes to MACE non-inferior to ESAs on DD and non-inferior comparable to placebo on NDD. . . all in all, I think it should help**

**understand I think the overall profile of the product better, and I'm optimistic about given our preparation that we will have a good showing.**" (Emphasis added). Therefore, Defendant Conterno continued to keep the stock price inflated through his material misstatements.

### June 4, 2021 Jefferies Healthcare Conference

136.    On June 4, 2021, Defendant Conterno participated in the Jefferies Healthcare Conference (the "June 4, 2021 Conference"). During June 4, 2021 Conference, Defendant Conterno again highlighted "**that Roxadustat has shown comparability when it comes to both placebo in non-dialysis dependent and relative to EPO in DD." Defendant Conterno further claimed that the hazard ratio estimate for DD patients was "still below 1 and it looks very, very positive.**" (Emphasis added).

### June 10, 2021 Goldman Sachs 42nd Annual Global Healthcare Conference

137.    On June 10, 2021, Defendant Conterno presented at the Goldman Sachs 42nd Annual Global Healthcare Conference (the "June 10, 2021 Conference"). In response to an analyst inquiry regarding the safety of the updated Roxadustat data, Defendant Conterno stated again that "what the data shows is -- what the analogy shows is basically the Roxadustat is comparable to ESAs to EPO in the DD setting and comparable to placebo in the NDD setting."

138.    On June 15, 2021, before the entire truth regarding Roxadustat's prospects were finally revealed, Defendant Cotroneo again took advantage of the inflated stock price and sold 4,053 shares of FibroGen stock, reaping more than $103,000 in total proceeds. Collectively, as they continued to issue false and misleading statements to the investing public, the Insiders collectively reaped over $52 million from the sale of FibroGen stock while in possession of material, non-public information regarding Roxadustat's NDA approval prospects.

**The Truth is Fully Revealed**

*July 15, 2021 FDA Advisory Committee Decision*

139.     The full extent of the Individual Defendants' fraud was revealed on July 15, 2021, when investors finally learned that the Individual Defendants had failed to disclose critical, prespecified "sensitivity" analyses that had been mandated by – and were ultimately revealed by – the FDA. These critical analyses conclusively demonstrated that the true results of the Roxadustat trials were even worse than what the Individual Defendants had publicly revealed on April 6, 2021. They also revealed that the drug was materially inferior to both placebo and Epogen, thereby dooming Roxadustat's FDA approval prospects for any patient population at all.

140.     On July 15, 2021, the FDA Advisory Committee published an FDA briefing document in connection the FDA Advisory Committee Meeting. The briefing document stated that "[t]he principal issue before the Committee is the drug's safety," and noted that "the drug was hoped to achieve efficacy at least comparable to ESAs, with fewer safety issues." With respect to efficacy, after reviewing Roxadustat's trial data, the FDA Advisory Committee Meeting concluded that Roxadustat's "benefits are difficult to calculate here," including the purported red cell blood transfusion benefit, which the FDA briefing document found was inconclusive at best. With respect to safety, the FDA Advisory Committee Meeting concluded that Roxadustat's safety data demonstrated numerous severe and alarming risks. Indeed, the briefing document noted that "[t]he rate of death was higher in patients who had received [R]oxadustat" as compared to Epogen, with the "leading causes of death [being] infections, 'renal' deaths, and sudden cardiac deaths." The briefing document further highlighted numerous signals for major adverse events associated with Roxadustat use, including "serious

thromboembolic events," sepsis, stroke, seizures, congestive heart failure, and hypoglycemia, among several others.

141.     Roxadustat's true, undisclosed FDA prespecified sensitivity analyses showed that each and every one of the Individual Defendants' Relevant Period statements concerning the drug's safety and efficacy were demonstrably false. Indeed, these analyses demonstrated that the hazard ratios that the Individual Defendants repeatedly touted during the Relevant Period were not accurate representations of Roxadustat's safety because, under the sensitivity analyses, the upper bound hazard ratios for each analysis were all at or significantly above 1.3. This was significant because, throughout the Relevant Period, the Individual Defendants told investors that the FDA's upper bound for hazard ratios, *i.e.*, the "non-inferiority" margin that the FDA would be looking for in the trial results, was 1.3.

142.     Further, in connection with the FDA Advisory Committee Meeting, the FDA made clear that the Individual Defendants' representations concerning the non-inferiority margin of 1.3 were also false. Indeed, the FDA explicitly stated that the agency never "agree[d] with [FibroGen's] proposed [non-inferiority] margin of 1.3" because "it was defined [by FibroGen] after the results of the study were known.. In other words, FibroGen had set the 1.3 target for itself, *post hoc* and after the data were fully unblinded, with no agreement from the FDA.

143.     The FDA further revealed that, during its pre-NDA meetings with FibroGen, the FDA "had a goal of 1.25" – a significantly lower non-inferiority margin than 1.3 – which the Individual Defendants had concealed from investors. The FDA specifically noted that "**that's what we discussed during meetings[,] [s]o that's why there was not an agreement on 1.3**." (Emphasis added). Thus, every statement the Individual Defendants had made during the Relevant Period about how they had shown "non-inferiority" relative to the upper bound hazard

ratio threshold of 1.3, unbeknownst to investors, was materially false and misleading. As far as the FDA was concerned, that threshold was completely meaningless and, in fact, the FDA had expressly told FibroGen that the agency was looking for a hazard ratio no greater than 1.25.

144.   Given the serious safety issues that these sensitivity analyses had revealed regarding Roxadustat, the FDA Advisory Committee Meeting would ultimately vote overwhelmingly against approving Roxadustat for any patient population.

145.   Indeed, based on the significant concerns about both the efficacy and safety of Roxadustat, the FDA Advisory Committee panel voted virtually unanimously against approval of Roxadustat. Specifically, the panel voted 13-1 against approval of Roxadustat in non-dialysis dependent patients, with the FDA Advisory Committee Meeting minutes stating that committee members had cited in support of their decision, among other things, "concerning safety risks" including "risks of thrombosis and mortality" and "untested proposed mitigation dosing strategy with unknown efficacy." The panel further noted in support of their "no" vote that, despite the Individual Defendants' numerous statements that Roxadustat had shown statistically significant improvement in quality of life, in truth, "members noted a surprising lack of improvement in quality of life." With respect to the DD patients, the panel voted 12-2 against approval of Roxadustat, with panelists again universally concerned with the drug's safety profile in light of the "increased mortality when compared to [Epogen]" and the committee's conclusion that it was "unclear whether the drug's benefit would be maintained with a lower Roxadustat dose."

146.   Following this devastating blow to Roxadustat's prospects for approval, trading in FibroGen's stock was halted on July 15, 2021. When trading reopened the following day and the market digested what the FDA Advisory Committee had disclosed, investors finally understood the full extent of the Individual Defendants' prior misrepresentations concerning Roxadustat's

safety profile and the drug's exceedingly slim prospects for FDA approval.

147.    In summary, Roxadustat was neither safer nor more effective than Epogen. On this news, the Company's stock price fell to $14.35 on July 16, 2021, a Friday. The stock continued to tumble after the weekend, plummeting to $13.72 on July 19, 2021, a 44% decrease from July 15, 2021's closing price of $24.84.

148.    Shortly thereafter, on August 11, 2021, FibroGen announced what the market had already been expecting – that it had received a "Complete Response Letter"[5] from the FDA confirming that the FDA would not approve Roxadustat for any patient population. The Company's press release stated, without actually publishing the Complete Response Letter itself, that "[t]he letter indicates the FDA will not approve the Roxadustat NDA in its present form and has requested additional clinical study of Roxadustat to be conducted."

**The False and Misleading Proxy Statements**

149.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements on April 23, 2020 (the "2020 Proxy") and April 13, 2021 (the "2021 Proxy").[6] The 2020 Proxy and the 2021 Proxy are collectively referred to herein as the "Proxies."

150.    The 2020 Proxy recommended, among other things, that shareholders elect

---

[5] The FDA sends a complete response letter to communicate that it has completed its review of an NDA and decided that it will not approve the application in its present form. *See* Motley Fool Staff, *What Is a FDA Complete Response Letter?*, The Motley Fool (Feb. 16, 2017), https://www.fool.com/knowledge-center/what-is-a-fda-complete-response-letter.aspx.

[6] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

Individual Defendants Conterno, Kearns, Kurkijärvi, and Lema as directors for three-year terms. The 2020 Proxy assured stockholders that the Board and its committees regularly assessed and managed the risks that FibroGen faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. Specifically, the 2020 Proxy stated:

**ROLE OF THE BOARD IN RISK OVERSIGHT**

One of the Board's key functions is informed oversight of the Company's risk management process. Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various standing committees of the Board that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company. Our audit committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The audit committee also monitors legal matters and compliance with legal and regulatory requirements regarding the Company's financial statements and accounting or other policies. Our nominating and corporate governance committee monitors the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. Our compensation committee assesses and monitors whether any of our compensation policies and programs have the potential to encourage excessive risk-taking. It is the responsibility of the committee Chairs to report findings regarding material risk exposures to our board of directors as quickly as possible. In addition, our board of directors meets with certain members of our executive team, including the heads of our business, compliance and regulatory functions, who discuss the risks and exposures involved in their respective areas of responsibility, as well as any developments that could impact our risk profile or other aspects of our business.

151.    The 2020 Proxy also noted that one of the functions of the Audit Committee was to review the Company's policies on risk assessment and risk management.

152.    Further, the 2020 Proxy touted purportedly key operational results regarding the development of Roxadustat, highlighted the achievements of named executive officers relating to the development of Roxadustat, and assured investors that Defendant Conterno "is exceptionally

qualified to serve as our Chief Executive Office[r] and on our board of directors as we prepare for the global commercialization of Roxadustat and continue the advancement of our clinical programs."

153.    In describing the Company's 2019 Bonus Plan, the 2020 Proxy claimed that all of the 2019 corporate goals concerning Roxadustat had been achieved to at least a 50% achievement level. Indeed, three executive officers (including Defendants Chung and Yu) received an additional special RSU award for, *inter alia*, completing roxadustat Phase 3 studies in the U.S. and Europe.

154.    The 2020 Proxy assured stockholders that the Individual Defendants were involved with FibroGen's operations, actively monitored the Company's risks and exposures, and had achieved significant goals relating to the development and commercialization of roxadustat. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls, which resulted in the manipulation of data to make FDA approval of Roxadustat appear more likely and the issuance by the Company of various false and misleading statements, including that roxadustat had met certain objectives it had not actually met.

155.    The 2021 Proxy contained comparable provisions to the 2020 Proxy regarding risk oversight and the Audit Committee's role in risk assessment and risk management. Moreover, although the 2021 Proxy noted that the Company had not received FDA approval for its NDA for Roxadustat, Individual Defendants nevertheless touted the substantial work the Company had done towards reaching that goal and highlighted other purported achievements related to the drug. As such, the 2021 Proxy was also materially false and misleading.

156.    The 2021 Proxy recommended, among other things, that shareholders elect

Individual Defendants Schoeneck, Henderson, and Ho as directors for three-year terms.

157.    As a result of the materially false and misleading statements in the Proxies, the Company's stockholders voted via uninformed stockholder votes to reelect the Individual Defendants proposed for reelection in the Proxies.

## **FIDUCIARY DUTIES**

158.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe FibroGen and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage FibroGen in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of FibroGen and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

159.    Each Individual Defendant owes and continues to owe FibroGen, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

160.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of FibroGen, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with FibroGen, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

161.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

a) ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

b) conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

c) remain informed as to how FibroGen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

d) truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct**

162.    The Individual Defendants, as officers and/or directors of FibroGen, were bound by the Company's Code of Business Conduct and Ethics[7] (the "Code of Conduct") which required the following:

We expect every employee, officer and director to read and understand this Code and its application to the performance of his or her business responsibilities. References in this Code to employees are intended to cover officers and, as applicable, directors.

Officers, managers and other supervisors are expected to develop in employees a

---

[7] *See* FibroGen, Inc. Code of Business Conduct and Ethics (Sept. 2017), https://fibrogen.gcs-web.com/static-files/a9d04c12-9fb7-41b7-b5e9-19d8eeb73361.

sense of commitment to the spirit, as well as the letter, of this Code. Supervisors are also expected to ensure that all agents and contractors conform to Code standards when working for or on behalf of the Company. Nothing in this Code alters your employment relationship with the Company.

\*\*\*

## 1.    HONEST AND ETHICAL CONDUCT

It is the policy of the Company to promote high standards of integrity by **conducting our affairs in an honest and ethical manner**. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

## 2.    LEGAL COMPLIANCE

Obeying the law is the foundation of this Code. Our success depends upon each employee, officer and director operating within legal guidelines and cooperating with local, national and international authorities. We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Compliance Officer.

Disregard of the law will not be tolerated. Violation of laws, rules and regulations of any country may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including email, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

## 3.    INSIDER TRADING

Employees, officers and directors who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential (or "*inside*") information. **To use material nonpublic information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees, officers and directors must exercise the utmost care when handling material inside information.**

**We have adopted a separate Insider Trading and Trading Window Policy with which you will be expected to comply as a condition of your employment with the Company. You should consult our Insider Trading and Trading Window Policy for more specific information on the definition of "inside" information and on buying and selling our securities or securities of companies with which we do business.**

\*\*\*

**5.      RESEARCH AND DEVELOPMENT; REGULATORY COMPLIANCE**

The research and development of biopharmaceutical products is subject to a number of legal and regulatory requirements, including **standards related to ethical research procedures and proper scientific conduct. We expect our employees, officers, and directors to comply with all such requirements.**

\*\*\*

**9.      CONFLICTS OF INTEREST**

We respect the rights of our employees, officers, and directors to manage their personal affairs and investments and do not wish to impinge on their personal lives. However, employees, officers and directors should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of the Company. **A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation.** We expect our employees to be free from influences that conflict with the best interests of the Company or might deprive the Company of their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest are prohibited unless specifically authorized as described below.

\*\*\*

Although no list can include every possible situation in which a conflict of interest could arise, the following are examples of situations that may, depending on the facts and circumstances, involve problematic conflicts of interests for employees, officers and directors:

\*\*\*

- **Taking personal advantage of corporate opportunities.** See Section 10 for further discussion of the issues involved in this type of conflict.

***

**10.   CORPORATE OPPORTUNITIES**

**You may not take personal advantage of opportunities for the Company that are presented to you or discovered by you as a result of your position with us or through your use of corporate property or information, unless authorized by your supervisor, the Compliance Officer or, if you are an executive officer or director, the Audit Committee, as described in Section 9. Even opportunities that are acquired privately by you may be questionable if they are related to our existing or proposed lines of business**. Significant participation in an investment or outside business opportunity that is directly related to our lines of business must be pre-approved. **You may not use your position with us or corporate property or information for improper personal gain**, nor should you compete with us in any way. If you discover or are presented with a business opportunity through the use of corporate property or information or because of your position with the Company, you should first present the business opportunity to the Company.

**11.   MAINTENANCE OF CORPORATE BOOKS, RECORDS, DOCUMENTS AND ACCOUNTS; FINANCIAL INTEGRITY; PUBLIC REPORTING**

**The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries in our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or otherwise, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, partners, contributors, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.** We require that:

- **No entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods**;

- **Transactions be supported by appropriate documentation**;

- **The terms of commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records**;

- **Employees comply with our system of internal controls**; and

- No cash or other assets be maintained for any purpose in any unrecorded or

"off-the-books" fund.

(Emphasis in bold and underline added).

163.    The Individual Defendants failed to adhere to the Code of Conduct by allowing the Company to issue materially false and misleading statements regarding Roxadustat's clinical trial data and claiming that the drug had met certain objectives, which would likely lead to FDA approval. Further, they allowed or failed to prohibit insider trading at the Company.

164.    In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period – Edwards, Ho, Kurkijärvi, Lema, Riggs, and Schoeneck – owed specific duties to FibroGen under the Charter of the Audit Committee of the Board of Directors (the "Audit Charter").[8] Specifically, the Audit Charter provided for, *inter alia*, the following responsibilities of the Audit Committee Defendants:

> **PURPOSE AND POLICY**
>
> The primary purpose of the Audit Committee (the "***Committee***") of the Board of Directors (the "***Board***") of FibroGen, Inc. (the "***Company***") shall be to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to (i) the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports, … (ii
> (iii) the review of any reports or other disclosure required by the applicable rules and regulations of the Securities and Exchange Commission (the "***SEC***") to be included in the Company's annual proxy statement, periodic reports, and registration statements within the scope of authority outlined herein, (iv) the review of and approval or disapproval of any related party transactions, (v) the review of any complaints or violations regarding accounting, internal accounting controls or auditing matters, the Company's Code of Conduct and Ethics, or any anti-bribery or anti-corruption policy, and the supervision of any related investigation and implementation of any corrective actions, and (vi) the

---

[8] *See* FibroGen, Inc. Charter of the Audit Committee of the Board of Directors (June 4, 2020), https://fibrogen.gcs-web.com/static-files/8d232fec-1ae0-4460-bd9c-efe8a8c8e8b8.

performance of the Company's internal audit function, if any.

The policy of the Committee, in discharging these obligations, shall be to maintain and foster an open avenue of communication between the Committee and the Auditors and the Company's financial management and internal audit teams.

\*\*\*

**OPERATING PRINCIPLES AND PROCESSES**

In fulfilling its functions and responsibilities, the Committee should give due consideration to the following operating principles and processes:

- *Communication* – Regular and meaningful contact with the Board, members of senior management and independent professional advisors to the Board and its various committees, as applicable, shall be encouraged as a means of strengthening the Committee's knowledge of relevant current and prospective corporate accounting and financial reporting issues.

\*\*\*

**RESPONSIBILITIES**

The Committee's responsibility is one of oversight. The members of the Audit Committee are not employees of the Company, and they do not perform, or represent that they perform, the functions of management or the Auditors.

\*\*\*

The Committee shall **oversee the Company's financial reporting process on behalf of the Board,** shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. … To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and responsibilities with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock may be listed) deviate from these activities as appropriate under the circumstances:

\*\*\*

8.      *Audited Financial Statement Review.* To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and any disclosure from

the Company's CEO and CFO to be made in connection with the certification thereof, and to recommend whether or not such financial statements should be so included.

9.     ***Annual Audit Results.*** To review with management and the Auditors, the results of the annual audit, including the Auditors' assessment of the quality of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements), **all material findings, including misstatements and weaknesses, if any, [of] the adequacy of the disclosures in the financial statements,** and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB. **To review with management and inquire of the CEO, CFO, controller, Director of Internal Audit or any other persons requested by the Committee, regarding the subjective and objective quality and integrity of the Company's financial statements and earnings.**

\*\*\*

11.     ***Quarterly Results and Reports on Form 10-Q.*** To review with management and the Auditors, as appropriate, **the results of the Auditors' review of the Company's quarterly financial statements and any disclosure from the Company's CEO and CFO to be made in connection with the certification of the Company's quarterly reports filed with the SEC,** prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB. To review with management and the Auditors, to the extent appropriate, other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required in Item 601(b)(31) of Regulation S-K and relevant reports rendered by the Auditors (or summaries thereof).

12.     ***Management's Discussion and Analysis.*** To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports and other filing with the SEC.

13.     ***Press Releases.*** To review with management and the Auditors, to the extent appropriate, **earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies** (including, without limitation, reviewing any pro forma or

non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

14. ***Accounting Principles and Policies.*** To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under GAAP related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures **and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies** if, in the judgment of the Committee, such review is necessary or appropriate.

15. ***Risk Assessment and Management.*** To review and discuss with management and the Auditors, as appropriate, **the Company's guidelines and policies with respect to financial risk management and financial risk assessment, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.**

\*\*\*

21. ***Internal Control over Financial Reporting; Disclosure Controls.*** To confer with management, the Director of Internal Audit, if any, and the Auditors, as appropriate, **regarding the scope, adequacy, and effectiveness of internal control over financial reporting, including computerized information system controls and security, and the Company's disclosure controls and procedures, including any significant deficiencies and significant changes in internal controls. To obtain reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.**

\*\*\*

26. ***Ethical Compliance.*** To review with management, including the Company's general counsel and Director of Internal Audit, if any, the results of management's efforts to monitor compliance with the Company's programs and **policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Business Conduct and Ethics, including review and oversight of related-party transactions as required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock is listed.**

\*\*\*

**32.**  ***Proxy Report.*** To oversee the preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

\*\*\*

**34.**  ***Report to Board.*** To report to the Board with respect to **material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements,** the performance or independence of the Auditors, the performance of the Company's internal audit function (as applicable) or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

\*\*\*

**37.**  ***Other Legal and Finance Matters.*** To review, with the Company's counsel, **legal compliance and legal matters that could have a significant impact on the Company's financial statements.** To review, with management, the Company's finance function, including its budget, organization and quality of personnel.

(Emphasis in bold and underline added).

165.   The Audit Committee Defendants failed to adhere to the Audit Charter and the Code of Conduct by issuing false and materially misleading public statements and filings with the SEC related to the Roxadustat's clinical trial data, falsely claiming that the drug had met certain objectives, and would likely receive FDA approval.

## BREACHES OF DUTIES

166.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of FibroGen, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

167.   The Individual Defendants breached their duties of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding

Roxadustat's clinical trial data, as well as their claims that the drug had met certain objectives and would likely receive FDA approval as described herein. The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused FibroGen substantial damage.

168.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duties of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee FibroGen's public statements and internal control function.

169.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of FibroGen, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, FibroGen has expended, and will continue to expend, significant sums of money.

**DAMAGES TO FIBROGEN**

170.    The materially false and misleading statements have exposed FibroGen to reputational and financial damages, including but not limited to:

        a)  Possible loss of crucial funding for future drug trials;

        b)  Liability arising from the Federal Securities Class Action;

        c)  The loss of credibility with customers and suppliers; and

d)  Legal costs associated with litigation, investigations, and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

171.    Plaintiff brings this action derivatively and for the benefit of FibroGen to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of FibroGen, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

172.    FibroGen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

173.    Plaintiff is, and has been, during the Relevant Period, a stockholder of FibroGen. Plaintiff will adequately and fairly represent the interests of FibroGen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

174.    Plaintiff repeats and re-alleges each allegation stated above as if fully set forth herein.

175.    A pre-suit demand on the Board of FibroGen is futile and, therefore, excused. At the time of filing this action, the Board consists of 11 directors: (i) Blaug; (ii) Brennan; (iii) Cravatt; (iv) Conterno; (v) Edwards; (vi) Henderson; (vii) Ho; (viii) Kearns; (ix) Lema; (x) Riggs; and (xi) Schoeneck (the "Director Defendants"). Plaintiff needs only to allege demand futility as to a majority (*i.e.*, six) of the Directors who are on the Board at the time this action is commenced.

176.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make

66

false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

177.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

178.    Demand on Defendant **Blaug** is futile because Blaug has served as a Company director since 2019. She has received and continues to receive compensation for her role as a director. For these reasons, Blaug breached her fiduciary duties, faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon her is futile and, therefore, excused.

179.    Demand on Defendant **Brennan** is futile because Brennan has served as a Company director since August 5, 2020. She has received and continues to receive compensation for her role as a director. For these reasons, Brennan breached her fiduciary duties, faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon her is futile and, therefore, excused.

180.    Demand on Defendant **Cravatt** is futile because Cravatt has served as a Company director since August 5, 2020. He has received and continues to receive compensation for his role as a director. For these reasons, Cravatt breached his fiduciary duties, faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation

demand, and thus demand upon him is futile and, therefore, excused.

181. Demand on Defendant **Conterno** is futile because Conterno is the CEO and has also been a director of the Company since January 6, 2020. Defendant Conterno personally made materially false and misleading statements and omissions in press releases and during earnings calls, investor conferences, and industry presentations, including on February 25, 2020; May 14, 2020; June 2, 2020; June 4, 2020; June 9, 2020; August 6, 2020; September 9, 2020; September 16, 2020; November 5, 2020; November 17, 2020; November 19, 2020; March 1, 2021; March 2, 2021; April 6, 2021; May 10, 2021; May 13, 2021; June 4, 2021; and June 10, 2021. Defendant Conterno also reviewed, approved, personally signed and certified FibroGen's quarterly and annual filings with the SEC on Form 10-K, including on March 2, 2020 and the 2Q2020 10-Q. He is also a named defendant in the Federal Securities Class Action. For these reasons, Conterno breached his fiduciary duties, faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon him is futile and, therefore, excused.

182. Further, Defendant Conterno is not disinterested or independent, and therefore, is incapable of considering demand because Conterno (as CEO) is an employee of the Company who derived substantially all of his income from his employment with the Company. The 2021 Proxy admits that Defendant Conterno is not independent. This lack of independence and the financial benefits received renders him incapable of impartially considering a demand to commence and vigorously prosecute this action against Defendants Blaug, Brennan, Cravatt, Edwards, Henderson, Ho, Kearns, Lema, Riggs, and Schoeneck. Additionally, Defendant Schoeneck's and Kearns' insider trades during the relevant period yielded them a material personal benefit that would be the subject of a litigation demand. For these reasons, Defendant

Conterno is not disinterested or independent from Defendants Blaug, Brennan, Cravatt, Edwards, Henderson, Ho, Kearns, Lema, Riggs, and Schoeneck who face a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand.

183.    Demand on Defendant **Edwards** is futile because Edwards has served as a Company director since 2015. He has received and continues to receive compensation for his role as a director and has been Chairman of the Audit Committee during the Relevant Period. For these reasons, Edwards breached his fiduciary duties, faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon him is futile and, therefore, excused.

184.    Demand on Defendant **Henderson** is futile because Henderson has served as a Company director since 2015. He has received and continues to receive compensation for his role as a director. For these reasons, Henderson breached his fiduciary duties, faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon him is futile and, therefore, excused.

185.    Demand on Defendant **Ho** is futile because Ho has served as a Company director since 2018. She has received and continues to receive compensation for her role as a director and has served as a member of the Audit Committee during the Relevant Period. For these reasons, Ho breached her fiduciary duties, faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon her is futile and, therefore, excused.

186.    Demand on Defendant **Kearns** is futile because Kearns has served as a FibroGen director since 1996. He has received and continues to receive compensation for his role as a director. Defendant Kearns also received a material personal benefit of approximately

$1,047,434 for sales of stock during the Relevant Period. These sales were made in March 2020 and March 2021 while Defendant Kearns was in possession of proprietary adverse material non-public information regarding Roxadustat's true potential for achieving NDA approval. For these reasons, Kearns received a material personal benefit, breached his fiduciary duties, and faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon him is futile and, therefore, excused.

187.    Demand on Defendant **Lema** is futile because Lema has served as a Company director since 2017.  He has received and continues to receive compensation for his role as a director and has been a member of the Audit Committee during the Relevant Period. For these reasons, Lema breached his fiduciary duties, faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon him is futile and, therefore, excused.

188.    Demand on Defendant **Riggs** is futile because Riggs has served as a Company director since 1993.  He has received and continues to receive compensation for his role as a director. For these reasons, Riggs breached his fiduciary duties, faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon him is futile and, therefore, excused.

189.    Demand on Defendant **Schoeneck** is futile because Schoeneck is Chairman of the Board and has served as a Company director since April 2010. Schoeneck was appointed Chairman in January 2020. In addition, Defendant Schoeneck served as interim CEO of FibroGen from August 2019 through January 2020. He has received and continues to receive compensation for his role as a director as described herein and has been a member of the Audit Committee during the Relevant Period. He is a named defendant in the Federal Securities Class

Action. Schoeneck made false and misleading statements during the Company's November 11, 2019 conference call with investors, and also reviewed, approved, signed and certified the 3Q2019 10-Q, which contained materially false and misleading statements and omissions. Further, he received a material personal benefit of approximately $515,457 for sales of stock during the Relevant Period. These sales were made in January, February, March, April and May 2019 while Defendant Schoeneck was in possession of proprietary adverse material non-public information regarding Roxadustat's true potential for achieving NDA approval. For these reasons, Schoeneck received a material personal benefit, breached his fiduciary duties, and faces a substantial likelihood of liability on the claims described herein that would be the subject of a litigation demand, and thus demand upon him is futile and, therefore, excused.

190.   As trusted Company directors, the above directors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

191.   Defendants Conterno and Henderson also have an extensive and longstanding business relationship, which precludes them from acting independently and in the best interests of the Company and the shareholders. Defendants Conterno and Henderson held executive positions at Eli Lilly & Co. These conflicts mean these defendants could not adequately monitor the Company's operations and internal controls, and call into question these Individual Defendants' conduct. Thus, demand upon Conterno and Henderson would be futile for this

reason, in addition to the reasons outlined above.

192.    Pursuant to the Company's Audit Charter, the Director Defendants who served on the Audit Committee during the Relevant Period are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Director Defendants who served on the Audit Committee during the Relevant Period, Defendants Schoeneck, Edwards, Ho, and Lema, failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Director Defendants who served on the Audit Committee during the Relevant Period breached their fiduciary duties, are not disinterested, and demand is excused as to them, in addition to the reasons above.

193.    The 2020 Proxy and 2021 Proxy state that the Individual Defendants Kearns, Blaug, Lema, and Riggs, while serving on the Compensation Committee during the Relevant Period, approved generous compensation to the Company's executives, even while these persons were causing the Company to issue false and misleading statements and engage in insider sales as outlined herein. Moreover, these highly lucrative compensation awards, including bonuses and awards of stock options worth tens of millions of dollars, were directly tied to FibroGen meeting regulatory and commercial milestones with respect to Roxadustat, which Individual Defendants were falsely touting. Defendants Kearns, Blaug, Lema, and Riggs's approval of this compensation while this wrongdoing was occurring constitutes a breach of fiduciary duty.

194.    The Federal Securities Class Action is still pending. Thus, the pendency of the Federal Securities Class Action means it is impossible for the Director Defendants to impartially

consider a stockholder demand as to the allegations herein.

195.   Many of the materially false and misleading statements were made in furtherance of the Individual Defendants' scheme regarding Roxadustat.

196.   In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including insider trading, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

197.   FibroGen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FibroGen any part of the damages FibroGen suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

198.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all, and if not all at least a majority, of the Director Defendants face a

substantial likelihood of liability and/or received a material personal benefit, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

199.   The acts complained of herein constitute violations of fiduciary duties owed by FibroGen's officers and directors, and these acts are incapable of ratification.

## **FIRST CLAIM**

**Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

200.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

202.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

203.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

204.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

205.    The false and misleading elements of the annual Proxies led to the re-elections of Defendants Conterno, Henderson, Ho, Kearns, Kurkijärvi, Lema, and Schoeneck, allowing them to continue breaching their fiduciary duties to FibroGen.

206.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

207.    Plaintiff, on behalf of FibroGen, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

208.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209.    The Individual Defendants, by virtue of their positions with FibroGen and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of FibroGen and

officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause FibroGen to engage in the illegal conduct and practices complained of herein.

210.    Plaintiff, on behalf of FibroGen, has no adequate remedy at law.

## THIRD CLAIM

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of FibroGen's business and affairs.

213.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

214.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of FibroGen.

215.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

216.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

217.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the

Relevant Period, that assured investors that FibroGen was on track regarding Roxadustat's clinical trials and claimed that the drug had met certain objectives which would likely receive FDA approval, yet failed to disclose major problems which included: (a) Roxadustat's data was not based on pre-specified analyses that FibroGen had agreed upon with the FDA and the data did not support Individual Defendants' claims about the supposed efficacy and safety of their key drug. Rather; (b) the Individual Defendants had deliberately manipulated the data, making a series of statistically significant and improper after-the-fact changes to every single one of nine clinical trial analyses; (c) once the Individual Defendants' *post hoc* manipulations were corrected, the true data revealed that Roxadustat was deficient and demonstrated substantial safety concerns, including increased risk of serious afflictions such as thrombosis, seizures, stroke, and even death.

218.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

219.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

220.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

221.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

222.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FibroGen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

223.     Plaintiff, on behalf of FibroGen, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

224.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.     By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of FibroGen.

226.     The Individual Defendants either benefitted financially from the improper

78

conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from FibroGen tied to the performance or artificially inflated valuation of FibroGen, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

227.     Plaintiff, as a stockholder and a representative of FibroGen, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

228.     Plaintiff, on behalf of FibroGen, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

229.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and FibroGen will lose financing from investors and business from future customers who no longer trust the Company and its products.

231.     Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

232.     Plaintiff, on behalf of FibroGen, has no adequate remedy at law.

## SIXTH CLAIM

### Against Chung, Cotroneo, Neff, Kearns, Kurkijarvi, Schoeneck, and Yu
*for Insider Trading*

233.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

234.    As alleged above, Chung, Cotroneo, Neff, Kearns, Kurkijarv, Schoeneck, and Yu, possessed adverse material non-public information regarding Roxadustat's clinical trial data, claims that the drug had met certain objectives, and the Company's manipulation of data to make FDA approval of the drug appear likely. The Insiders sold shares for total proceeds of over $52 million between December 2018 and June 2021 while shareholders remained unaware of the full truth. They were motivated to do so, in whole or in part, by the possession of adverse material non-public information and they acted with scienter.

235.    When Defendants Chung, Cotroneo, Neff, Kearns, Kurkijarv, Schoeneck, and Yu sold their FibroGen stock, they knew that the investing public was unaware of the adverse material information that they possessed. They also knew that if the information was disclosed, the market price of FibroGen stock would be significantly lower. Defendants Chung, Cotroneo, Neff, Kearns, Kurkijarv, Schoeneck, and Yu timed their stock sales to take advantage of the Company's proprietary information and obtain a higher price for the stock they sold. They misappropriated FibroGen's material non-public information for their own personal gain, to the detriment of the Company and its stockholders.

236.    Plaintiff, on behalf of FibroGen, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of FibroGen, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached their fiduciary duties to FibroGen;

C.     Determining and awarding to FibroGen the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.     Directing FibroGen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect FibroGen and its stockholders from a repeat of the damaging events described herein;

E.     Awarding FibroGen restitution from Individual Defendants;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court may deem just and proper.

Dated: December 27, 2021

**BIELLI & KLAUDER, LLC**
*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
(302) 803-4600
rernst@bk-legal.com

**LEVI & KORSINSKY, LLP**
Correy A. Kamin
Ryan C. Messina
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
ckamin@zlk.com
rmessina@zlk.com

*Attorneys for Plaintiff Konan Chiang*

81